**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No: S1 12 Cr. 02 (JSR) |
| WEGELIN & CO., et al. | |

## SENTENCING MEMORANDUM OF WEGELIN & CO.

GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

*Attorneys for Wegelin & Co.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  PRELIMINARY STATEMENT ..................................................................................1

II. THE SENTENCE AGREED TO IN THE PLEA AGREMENT IS
    REASONABLE .........................................................................................................5

    A.  The Sentencing Guidelines Calculation Is Correct.................................................6

    B.  A Guidelines Departure Is Not Warranted In This Case ........................................8

III. CONSIDERATION OF THE SENTENCING FACTORS IN 18 U.S.C. § 3553(a)
     SUPPORTS THE IMPOSITION OF SENTENCE CONSISTENT WITH THE
     PLEA AGREEMENT ...............................................................................................9

    A.  The History And Characteristics Of Wegelin.....................................................10

    B.  The Nature And Circumstances Of The Offense ..................................................14

        1.  Background On Swiss Law And Practice.................................................14

        2.  Wegelin's Offense ..................................................................................15

    C.  The Need For The Sentence To Reflect The Seriousness Of The Offense,
        Promote Respect For The Law, Provide Just Punishment, Afford Adequate
        Deterrence, And Protect The Public From Further Crime....................................18

        1.  Wegelin's Decision Voluntarily To Appear In This Case And
            Plead Guilty Supports Imposition Of The Sentence Stipulated In
            The Plea Agreement..................................................................................19

        2.  The Dire Consequences That Have Befallen The Bank In The
            Wake Of The Indictment Support Imposition Of The Sentence
            Stipulated In The Plea Agreement ...........................................................25

        3.  The Total Amount Of Money Wegelin Has Agreed To Pay
            Supports Imposition Of The Sentence Stipulated In The Plea
            Agreement.................................................................................................28

    D.  The Need To Provide Restitution To Victims Of The Offense .............................31

        1.  A Comparison Of The Fees That Wegelin Received For Servicing
            Its Non W-9 Clients To The Agreed-Upon Tax Loss Supports
            Finding That The Agreed-Upon Tax Loss Is Reasonable ........................31

E.    The Need To Avoid Unwarranted Sentencing Disparities ....................................32

IV.    PROBATION IS NOT WARRANTED IN THIS CASE .................................................38

V.    CONCLUSION ..............................................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.,
    687 F. Supp. 2d 381 (S.D.N.Y. 2010)..................................................21

United States v. Alfred L. Wolff GmbH,
    2011 WL 4471383 (N.D. Ill. Sept. 26, 2011) .........................................20

United States v. Booker,
    543 U.S. 220 (2005)......................................................................5

United States v. Chitron Elecs. Co.,
    668 F. Supp. 2d 298 (D. Mass. 2009) ...................................................22

United States v. Crosby,
    397 F.3d 103 (2d Cir. 2005)..........................................................5, 8

United States v. Garcia,
    926 F.2d 125 (2d Cir. 1991)............................................................24

United States v. Johnson Matthey PLC,
    2007 U.S. Dist. LEXIS 56510 (D. Utah Aug. 2, 2007) ...............................22

United States v. Martinez-Rios,
    143 F.3d 662 (2d Cir. 1998)............................................................7

United States v. Pangang Group Co., LTD.,
    879 F. Supp. 2d 1052 (N.D. Ca. Jul. 23, 2012)....................................20, 22

United States v. Pub. Warehousing Co. K.S.C.,
    2011 U.S. Dist. LEXIS 32658 (N.D. Ga. Mar. 28, 2011)...........................22

United States v. Stewart,
    590 F.3d 93 (2d Cir. 2009)...........................................................28

STATUTES

18 U.S.C. § 3553.....................................................................passim

18 U.S.C. § 3571......................................................................7

18 U.S.C. § 3572...................................................................29, 31

18 U.S.C. § 3664......................................................................7

31 U.S.C. § 5318 ................................................................................................................21

F.R.Cr.P. 4 ..........................................................................................................19, 20, 22

U.S.S.G. ...................................................................................................................... passim

**OTHER AUTHORITIES**

David Bain, Wegelin Emerges as Switzerland's Best-Kept Secret,
    FINANCIAL NEWS, Apr. 14, 2008 ...................................................................1, 2, 12

David Bain, Wegelin Offers Investors Haven From Credit Crisis,
    WALL ST. J., Apr. 14, 2008 ........................................................................................1

Deferred Prosecution Agreement, United States v. UBS AG,
    Case No. 09-60033-CR-COHN ...........................................................................passim

EBK Investigation of the Cross-Border Business of UBS AG with its Private Clients in
    the USA:  Summary Report (Feb. 18, 2009) ....................................................34, 37

John Tagliabue, Swiss City Fears for Cultural Legacy in Wake of a Bank's Fall,
    N.Y. TIMES, Jan. 24, 2013 .......................................................................................13

Plea Agreement, United States v. Wegelin & Co.,
    12 CR 02 (JSR) ................................................................................................... passim

Press Release, The United States Attorney's Office for the Southern District of New
    York, Swiss Bank Pleads Guilty in Manhattan Federal Court To Conspiracy To
    Evade Taxes:  In First-Ever Guilty Plea to Tax Law Violations by a Foreign Bank,
    Wegelin & Co. Agrees to Pay $74 Million to the United States (Jan. 3, 2013) ...................10

Sentencing Memorandum of the United States, United States v. Bezonsky et al.,
    No. 06-394-06, 2007 WL 5032787 (E.D. Pa. May 18, 2007) ...........................39, 40

Sentencing Memorandum of the United States, United States v. Genentech, Inc.,
    No. CR-99-0141, 1999 WL 33740505 (N.D. Cal. May 3, 1999) ...........................40

Swiss Federal Act on International Mutual Assistance in Criminal Matters.........................23, 24

Transcript of Plea Hearing, United States v. Wegelin & Co.,
    12 CR 02 (JSR) (Jan. 3, 2012) ............................................................................7, 31

Transcript of Sentencing Hearing, United States v. Habibion, et al.,
    No. CR 11-118 (D.C. Cir. May 16, 2012) ..............................................................39

United States Sentencing Guidelines. ...................................................................................... passim

Unofficial Translation of the Decision of the Swiss Federal Criminal Court,
    Wegelin & Co. v. Federal Office of Justice (May 21, 2012) ...........................................23, 24

## I.    **PRELIMINARY STATEMENT**

Wegelin is Switzerland's oldest private bank.  Its origins date back to 1741, when it was founded by a textile merchant in St. Gallen, Switzerland, a small city near the German-Austrian border.  Throughout its history, Wegelin has been a small private bank predominantly servicing Swiss clients.  Prior to the institution of charges in this case, Wegelin had never been criminally prosecuted – either in the U.S., Switzerland, or anywhere else.  Historically in Switzerland, it had a strong reputation for being a fair and ethical institution, devoted to the craft of establishing long-term banking relationships rather than focusing on short-term profits, and a desirable place to work.  And this did not change when, after almost 250 years of family control, Wegelin's founding family decided to sell a majority stake of the bank to external partners.

In the early 1990s, two experienced bankers, Dr. Konrad Hummler and Dr. Otto Bruderer, joined the firm as managing partners.  As we describe in greater detail below (see infra at Section III(A)), they set about to transform this one-office regional bank into a creative, nimble, and modern bank, while preserving the core values of fairness, loyalty, and service for which the ancient brand was known.  They took a bank that had a single branch in St. Gallen with 30 employees and developed it into a bank with twelve branches and over 700 employees throughout the whole of Switzerland in the space of a decade.  By 2008 Wegelin would be identified by the Wall Street Journal as "one of the most dynamic wealth managers [in Switzerland], attracting clients at a faster pace than many of its competitors" and dubbed by another article "Switzerland's best-kept secret."[1]

---

[1]    See David Bain, Wegelin Offers Investors Haven From Credit Crisis, WALL ST. J. EUROPE, Apr. 18, 2008, available at webreprints.djreprints.com/41194.pdf; see also David Bain, Wegelin Emerges as Switzerland's Best-Kept Secret, FINANCIAL NEWS, Apr. 14, 2008, available at 109.69.159.8/sites/default/files/media/080414_financial_news.pdf.

None of this changed the Bank's core values and its professional ethos. Wegelin remained singularly focused on quality: it developed sophisticated financial products that helped it to gain visibility and credibility in the Swiss financial community. It remained true to its longstanding investment philosophy founded on liquidity, transparency, and sensible fees; and it remained true to its deep-rooted commitment to client service. While nearly all large wealth managers had product sales targets for the client advisors, Wegelin did not. Nor were bonuses tied to new client acquisitions. And it stuck to what it knew best: Switzerland and Swiss clients – a fact demonstrably confirmed by its pattern of growth. Unlike many of its competitors, which had been rapidly adding offices abroad, Wegelin did not follow the trend. As one partner explained to a foreign journalist, "There are enough opportunities at home for us not to think at this time about opening an office abroad." Bain, Wegelin Emerges, supra n.1.

Not surprisingly in light of this focus, Wegelin has never had any branches or offices in the United States. Wegelin also never had a United States desk or any business unit focused on the United States market. The Bank served international clients, but they were always a relatively modest percentage of the Bank's overall clients, and U.S. accounts never made up more than approximately 5% of Wegelin's client base. Indeed, Wegelin never even had a single banker focused exclusively on, or with even a majority of, U.S. clients.

In the wake of the publication of the Deferred Prosecution Agreement negotiated between the U.S. government and UBS AG in February 2009, as Wegelin grew to better appreciate the U.S. risk associated with opening and maintaining accounts for U.S. taxpayers, it undertook significant remedial efforts. In or about November 2009, Wegelin decided that it would no longer accept new non W-9 U.S. clients and would only accept W-9 U.S. clients in exceptional cases. In addition, in response to the increasing complexity involved in managing U.S. clients,

Wegelin required in December 2009 that all client advisors with U.S. clients participate in detailed training and pass a test on the rules relating to dealing with U.S. clients.  In the spring of 2011, after the initiation of the investigation that led to these charges, the Bank decided to take what is arguably the ultimate action to remediate concerns about U.S. clients; consistent with its business strategy as a Swiss-focused institution, the Bank determined that it would be best simply to no longer have any U.S. clients.  As of today's date, Wegelin's U.S. client exit process is substantially complete, and only approximately ten U.S. clients with inactive accounts remain.

The facts that give rise to Wegelin's involvement in this case concern its involvement in opening and maintaining bank accounts for U.S. taxpayers.  For much of modern history – and, indeed, much earlier too – foreigners, including U.S taxpayers, have opened bank accounts in Switzerland, and in numbers well out of proportion to the country's small size.  For Wegelin, these clients came rather episodically and not as a result of any program or plan to attract them.  While there have always been multiple motives for foreigners to open Swiss banks accounts, this case focused on U.S. taxpayers who sought to take advantage of the Swiss legal protection of bank privacy for the purpose of hiding assets in their Wegelin accounts and thereby evading the assessment of any tax associated with income and gains generated by those assets.

By pleading guilty, Wegelin acknowledges that this conduct was wrong despite its belief that, as a practical matter, it would not be prosecuted in the United States for this conduct because it had no branches or offices in the United States and because of its understanding that it acted in accordance with, and not in violation of, Swiss law and that such conduct was common in the Swiss banking industry.

Upon the initiation of the investigation into this conduct by the United States Attorney's Office for the Southern District of New York ("SDNY"), however, Wegelin endeavored to work

with the U.S. government, within the confines of what is permitted by Swiss law. This cooperation, leading up to the Plea Agreement and plea entered in this case, is extraordinary in several respects.

It is no small thing that Wegelin agreed to appear in U.S. District Court, accepted responsibility for its conduct and entered a guilty plea, despite the fact that there was no legal procedure that could allow the U.S. government to force it to appear in this case. As detailed more fully below, because Wegelin is a foreign company with no offices in the United States, neither U.S. nor Swiss law provided a basis to compel Wegelin to appear in this case. Perhaps even more significantly, Wegelin came to the U.S. and accepted responsibility despite understanding that, even if a criminal judgment were to be obtained against it in a contested proceeding, the judgment would likely be unenforceable in Switzerland. This understanding was based on an expert opinion provided by one of Switzerland's foremost legal authorities on, among other things, Switzerland's law on International Mutual Assistance in Criminal Matters.

Despite these facts, and its relative safety within Switzerland, Wegelin reached out to the prosecutors, through its lawyers, to initiate negotiations designed to resolve the case and to accept responsibility for its conduct. The Bank's decision to engage in negotiations with the government culminated in the detailed Plea Agreement submitted to the Court, which includes nearly $75 million in total payments, and the plea of guilty entered by the Bank before Your Honor on January 3rd – a result, as far as we have been able to confirm, that is unprecedented for a foreign financial institution in a criminal case.

As set forth below, we respectfully submit that the unusual circumstances of this case, including (1) Wegelin's decision to appear before this Court, accept responsibility for its actions and plead guilty, (2) the devastating financial consequences that Wegelin has already suffered as

a result of this case, and (3) the comparison of the Bank's conduct to the conduct of UBS, the only other Swiss bank to face charges related to these issues, all support the imposition of the sentence to which the parties have agreed in the Plea Agreement.

## II.    THE SENTENCE AGREED TO IN THE PLEA AGREMENT IS REASONABLE

In the aftermath of the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), the Second Circuit held that trial judges must engage in a three-step sentencing procedure.  See United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).  First, the Court must determine the applicable Sentencing Guidelines range.  Id. at 111-112.  Second, the Court is to consider whether a departure from the guidelines range is warranted.  Id.  And, finally, the sentencing court must consider the advisory guidelines range, along with all of the factors listed in 18 U.S.C. § 3553(a), to determine the sentence to impose.  Id.; Booker, 543 U.S. at 245-46.

Wegelin respectfully submits that the sentence agreed to by the parties in the Plea Agreement is "sufficient, but not greater than necessary," to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and afford adequate specific and general deterrence.  See 18 U.S.C. § 3553(a).

Pursuant to the Plea Agreement, the parties stipulated that Wegelin would make restitution to the United States in the amount of $20,000,001 (the "Restitution Amount"), which Wegelin admits represents the gross pecuniary loss to the United States as a result of the conduct admitted in this case.  The parties also agreed in the Plea Agreement that under the United States Sentencing Guidelines, the Guideline Fine Range applicable to Wegelin is $14,700,000 to $29,400,000 (the "Stipulated Guidelines Fine Range"), and that the appropriate fine in this case is $22,050,000 (the "Stipulated Fine Amount"), the midpoint of the Stipulated Guidelines Fine Range.

In addition to agreeing to pay the full Restitution Amount and the sizable Stipulated Fine Amount, Wegelin also agreed to forfeit $15,821,000 (the "Forfeiture Amount") to the United States, representing the gross fees paid to Wegelin from approximately 2002 through 2010 by U.S. taxpayers with undeclared accounts at Wegelin. Wegelin further agreed to seek no credit for the $16,290,693.42 that the Bank previously forfeited to the United States pursuant to a final order of forfeiture entered on or about April 24, 2012 in <u>United States v. All Funds on Deposit at UBS AG, Account no. 101-WA-358967-000, Held in the Name of Wegelin & Co.</u>, 12 Civ. 836 (LTS).

As a result, in connection with its voluntary guilty plea in this case, pursuant to the Plea Agreement, Wegelin has agreed to pay to the U.S. government nearly $75 million. Wegelin respectfully submits that the Plea Agreement represents a reasonable resolution of this case, and that Wegelin should be sentenced as outlined in the Plea Agreement.

### A.    The Sentencing Guidelines Calculation Is Correct

In this case, the parties agreed that the sentence outlined in the Plea Agreement is appropriate and consistent with the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). The draft Presentence Report ("Draft PSR") prepared by the Probation Department concurs with the parties' Sentencing Guidelines calculation. <u>See</u> Draft PSR Part D.[2]

First, the parties stipulated that pursuant to U.S.S.G. § 8C2.3(a), the Guidelines provisions applicable to the offense charged in Count One of the Superseding Indictment – <u>i.e.</u>, the offense to which Wegelin pled guilty – are U.S.S.G. §§ 2T1.1(a)(1) and 2T4.1(L). The tax loss figure used to determine Wegelin's base offense level under the Sentencing Guidelines is the same as the gross pecuniary loss that Wegelin has admitted – $20,000,001 – as this figure is a

---

[2]    Because of the expedited nature of the sentencing in this case, we have not yet received the final PSR, but do not expect the relevant substance or the paragraph numbers to change from the earlier draft we have received. If there are changes, we respectfully request permission to update this sentencing submission.

reasonable estimate of the total amount of loss caused by Wegelin's conduct in this case.[3]  See U.S.S.G. § 8A1.2, Application N. 1(I) (explaining that "loss" as used in Chapter 2 is the same as "[p]ecuniary loss" as derived from 18 U.S.C. § 3571(d)); see also id. § 2T1.1(c).  Because the tax loss is greater than $20,000,000 and less than $50,000,000, the base offense level under the Sentencing Guidelines is 28.  See U.S.S.G. §§ 2T1.1(a)(1) and 2T4.1(L).  The parties further agreed to increase the base offense level by 2 levels because the offense involved sophisticated means.  See U.S.S.G. §§ 2T1.1(b)(2).  Thus, the applicable Guidelines Offense Level for this case, as agreed to by the parties, and confirmed by the probation officer, is 30.  See Wegelin Plea Agreement, pp.3-4, Ex. 2; Draft PSR ¶ 89.

Second, the parties agreed that Wegelin's initial Culpability Score is 5, pursuant to U.S.S.G. § 8C2.5(a), which is increased by 3 points pursuant to U.S.S.G. § 8C2.5(b)(3)(A).  The parties also agreed that the Culpability Score should be reduced by 1 point as a result of Wegelin's demonstration of its acceptance of responsibility.  See U.S.S.G. § 8C2.5(g)(3).  As a result, Wegelin's final Culpability Score is 7.  Thus, pursuant to U.S.S.G. § 8C2.6, Wegelin's fine multiplier is 1.4 to 2.8 – a conclusion with which the probation officer, likewise, agrees.  See Wegelin Plea Agreement, p.4, Ex. 2; Draft PSR ¶ 99.

---

[3]    The tax loss drives the sentencing guidelines calculation of the fine and the determination of the appropriate amount of restitution.  The government has the burden of proving both.  18 U.S.C. § 3664(e); United States v. Martinez-Rios, 143 F.3d 662, 677 (2d Cir. 1998).  Pursuant to the Plea Agreement, Wegelin accepted the government's representation as to the tax loss used to calculate the fine and the restitution amount and has bound itself – as has the government – to accept this amount.  During the negotiations with the government, the government justified this tax loss number based upon an extrapolation derived from the UBS Deferred Prosecution Agreement.  Wegelin agreed that extrapolating the tax loss attributable to its offense from the tax loss attributed to UBS was reasonable, although various factors could support finding that using UBS as a comparison significantly overstates the actual tax loss attributable to Wegelin.  At the plea hearing before Your Honor, the government also indicated that it believed the tax loss figure was justifiable based on an extrapolation from data concerning Wegelin clients who participated in the Voluntary Disclosure Program.  See Transcript of Plea Hearing at 8:4-9:22, United States v. Wegelin & Co., 12 CR 02 (JSR) (Jan. 3, 2012), Ex. 1.  The Government had not previously shared the detail regarding that information with Wegelin.

Third, the parties stipulated that based on Wegelin's Offense Level of 30, Wegelin's base fine is $10,500,000. Pursuant to U.S.S.G. § 8C2.4(a), the Base Fine Amount is the greatest of three measures: (1) the amount derived from the table at § 8C2.4(d); (2) the pecuniary gain to the organization from the offense; or (3) the pecuniary loss, if any, that was "intentionally, knowing, or recklessly caused." Because $10.5 million is the greatest of the three measures, it is deemed to be the Base Fine Amount. See Wegelin Plea Agreement, p.4, Ex. 2; Draft PSR ¶ 90.

Finally, the parties agreed that based on Wegelin's fine multiplier of 1.4 to 2.8, and pursuant to U.S.S.G. § 8C2.7, the Guideline Fine Range is $14,700,000 to $29,400,000 (the "Stipulated Guidelines Fine Range"), and that the appropriate fine in this case is the midpoint of the Stipulated Guidelines Fine Range, or $22,050,000 (the "Stipulated Fine Amount"). See Wegelin Plea Agreement, p.5, Ex. 2.

### B.    A Guidelines Departure Is Not Warranted In This Case

The second Crosby factor requires the Court to decide whether a departure under the sentencing guidelines is warranted. Both parties have stipulated in the Plea Agreement not to seek a fine other than the Stipulated Fine Amount or to suggest to the Court to consider any alternative fine. See Wegelin Plea Agreement, p.5, Ex. 2. Here, neither party nor, to the best of our knowledge, Probation, has recommended any Guidelines departure.

Moreover, as the forthcoming review of the statutory factors set forth in 18 U.S.C. § 3553(a) establishes, a sentence within the guideline range as outlined in the Plea Agreement is consistent with those factors and, for the same reason, it is respectfully submitted that a departure is not warranted.

### III.   CONSIDERATION OF THE SENTENCING FACTORS IN 18 U.S.C. § 3553(a) SUPPORTS THE IMPOSITION OF SENTENCE CONSISTENT WITH THE PLEA AGREEMENT

The statutory factors that the Court must consider in determining the appropriate sentence most relevant to this case include:

(1)    the history and characteristics of the defendant;

(2)    the nature and circumstances of the offense;

(3)    the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes of the organization;

(4)    the sentencing guidelines range;

(5)    the need to avoid unwarranted sentencing disparities among defendants with similar records and conduct; and

(6)    the need to provide restitution to victims.

See 18 U.S.C. § 3553(a)(1), (2), (4), (6), (7).   Sentencing judges are guided by 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing, in light of these considerations.

As set forth below, we respectfully submit that an application of these factors to the facts of this case supports imposition of the $22,050,000 Stipulated Fine Amount, which represents the midpoint of the Stipulated Guidelines Fine Range, along with the other terms stipulated in the Plea Agreement.  We respectfully submit that the imposition of a fine above the Stipulated Fine Amount would be unnecessary in light of Wegelin's decision to appear before this Court, plead guilty and agree to make almost $75 million in payments, including restitution, forfeiture of the Bank's gross revenue earned from the offense and forfeiture of assets held in its correspondent bank account, and the devastating financial consequences Wegelin has already suffered as a result of the case.

A.    **The History And Characteristics Of Wegelin**

The circumstances of this unprecedented case are unique in a number of significant respects.  As the government acknowledged in its January 3, 2013 press release following the entry of Wegelin's guilty plea, the Bank's decision to plead guilty in this case is truly extraordinary:  it marks the first-ever guilty plea to tax law violations by a foreign bank and, in the government's own words, is a "watershed moment" in the government's efforts to hold individuals and banks accountable for their tax violations, "wherever they may be in the world." [4]

But Wegelin is not merely notable for its plea in this case.  Wegelin has been an uncommon institution; it has meant many things to many people.  To the founder of Wegelin, Caspar Zyli, it was a life's enterprise.  To his family and their descendants, a part of their rich ancestral history.  To the City of St. Gallen, Wegelin has been a permanent fixture, a major employer, perhaps the city's greatest cultural benefactor, and, as the oldest bank in Switzerland and one of the oldest independent banks in the world, a considerable source of civic pride.  To many of the employees who began as interns, working part-time as they finished graduate degrees at the prestigious University of St. Gallen, it is the only job they had ever known.  To the managing partners – and most especially Konrad Hummler and Otto Bruderer – it was to be most of their life's work.

Founded in 1741, Wegelin has been in continuous existence through revolts, uprisings, religious battles, world wars, economic collapses, and the decline of the very textile industry on which it was built.  In the early 1990s, after almost 250 years of family control, Wegelin's founding family decided to sell a majority stake of the Bank to managing partners Dr. Konrad

---

[4]    Press Release, The United States Attorney's Office for the Southern District of New York, "Swiss Bank Pleads Guilty in Manhattan Federal Court To Conspiracy To Evade Taxes:  In First-Ever Guilty Plea to Tax Law Violations by a Foreign Bank, Wegelin & Co. Agrees to Pay $74 Million to the United States" (Jan. 3, 2013), available at http://www.justice.gov/usao/nys/pressreleases/January13/WegelinPleaPR.php.

Hummler and Dr. Otto Bruderer.   Both had previously held various positions at the Union Bank of Switzerland (today's UBS), including that of personal advisor to the Chairman of the Board of Directors.   Hummler was also on the board of several Swiss corporations and philanthropic institutions; more recently he was Chairman of the Board of Neue Zürcher Zeitung, Zurich's leading daily newspaper.   Bruderer had led the establishment of the UBS European M&A business and served on the board of trustees of several asset management firms, banks, and family offices in Europe.   Leaving lucrative executive positions, the pair took on substantial personal financial risk as they assumed management of Wegelin.

In the early 1990s, Wegelin was a small bank with 30 employees whose average age was 55.   But the founders of the "modern Wegelin" – Hummler and Bruderer – felt that the Bank had a solid base and were set to modernize it, focusing on the three factors they deemed key to Wegelin's growth:   choosing the right people; building the bank's financial know-how; and modernizing Wegelin's information technology systems.

Recognizing that their efforts at modernizing the Bank could only be successful in the long term if they could rely on the strengths of a broader leadership team, the pair widened the circle of managing partners and established an ownership participation system, and gradually expanded the partnership from two to eight managing partners.

Their efforts not only succeeded, but flourished.   Hummler and Bruderer created a culture that encouraged initiative and innovation, and avoided much of the bureaucracy and politics characteristic of larger and more hierarchical institutions.   And so even though Wegelin lacked the budget to pay high-end salaries, it began to attract top talent.   A strategic link to the University of St. Gallen – providing a large talent pool – was also partly responsible for this success in recruiting.   As a result, the Bank consistently attracted smart young professionals and

created an egalitarian environment where good ideas were valued, regardless of where they came from.

This was not only true of the employees, but of the partners, too. With unlimited personal liability – which is how the modern Wegelin partnership was intentionally designed – the interests of each of the managing partners were aligned: they participated fully in the upside, as well as in the downside.

The Bank built in-house financial expertise, developing its own models to calculate interest rate risk, an options engine and symmetric financial instruments, all of which helped Wegelin to gain visibility and credibility in the Swiss financial community. The Bank invested very heavily in information technology and with its state-of-the-art infrastructure, it was able to market itself as an IT partner to other private banks that outsourced to Wegelin their back office functions and technology needs. This made the Bank's back office a profit center, energizing employees to develop further innovations. Bank personnel developed research-driven investment strategies, including Active Indexing, which enhanced investment performance. By 2009, Wegelin had become the biggest active quantitative investment manager in Switzerland. In addition to Active Indexing, the Bank established other financial strategies, including a currency hedge fund. With a talented team, Wegelin eschewed third-party investments, in favor of developing its own products.

In 1998, Wegelin opened its first branch office in Zurich. Success begat further success. Wegelin became "one of the most dynamic wealth managers [in Switzerland], attracting clients at a faster pace than its competitors." Bain, Wegelin Emerges, supra n.1. As noted, during little over 10 years, Wegelin grew from one small office of 30 employees in St Gallen to twelve branches, employing more than 700 employees throughout Switzerland. Through its tremendous

growth throughout the whole of Switzerland – including the much bigger and more cosmopolitan cities of Zurich, Geneva and the Swiss capital, Bern – Wegelin never abandoned its St. Gallen roots.  Indeed, a recent New York Times article recounts the considerable positive imprint Wegelin and its partners have left on St. Gallen – from their  significant sponsorship of cultural institutions in the area (including the establishment of the now world-renowned Johann Sebastian Bach Foundation and the underwriting of the restoration of a 19th century pipe organ) to the preservation of the town's architectural legacy (including the $15 million renovation of the late Gothic convent of St. Catherine).[5]

Not surprisingly in light of its Swiss focus, Wegelin has never had any branches or offices in the United States.  Although the Bank also served international clients, they were always a relatively modest percentage of the Bank's overall clients, and U.S. accounts never made up more than approximately 5% of Wegelin's client base.  Wegelin never had a U.S. desk, team, or division, or even any bankers that focused primarily on U.S. clients.

Throughout the time period at issue in this case, Wegelin provided private banking, wealth management, and other related financial services to clients who opened and maintained accounts at any of the Bank's branches.  Wegelin provided these services principally through "client advisors" based in its various branches in Switzerland.  In fact, the bank regarded its biggest strength to be client servicing.  While nearly all large wealth managers had product sales targets for the client advisors, Wegelin did not.  Nor were bonuses tied to new client acquisitions, as they were with many of Wegelin's competitors.  Providing superlative customer service was made easier by a tremendous staff-retention record.  Between the management buyout in the early 1990s and 2008, no client advisor had left to join a competitor.

---

[5]    See John Tagliabue, Swiss City Fears for Cultural Legacy in Wake of a Bank's Fall, N.Y. TIMES, Jan. 24, 2013, available at http://www.nytimes.com/2013/01/25/world/europe/swiss-city-fears-for-cultural-legacy-in-wake-of-a-banks-fall.html.

Wegelin also acted as custodian with respect to bank accounts that were managed by independent asset managers – a practice common in the Swiss banking industry. As with its own client base, most of the accounts managed by independent asset managers belonged to Swiss clients, but the Bank also allowed independent asset managers to open and manage accounts on behalf of international clients, including U.S. persons.

Before and during the period covered by the Indictment, Wegelin operated solely as a private bank in Switzerland, subject to Swiss law and supervised by the Swiss Financial Market Supervisory Authority ("FINMA"). Most critically, while the offense itself was a serious one for which Wegelin takes full responsibility, Wegelin's conduct was not criminal in Switzerland, the Bank's home country – which imposes no tax reporting obligations on banks, and in fact criminalizes such reporting except in limited circumstances.

We respectfully submit that consideration of these unique circumstances warrants imposition of the Stipulated Fine Amount and the other terms of the Plea Agreement. See 18 U.S.C. § 3553(a)(1).

### B.    The Nature And Circumstances Of The Offense

#### 1.    Background On Swiss Law And Practice

Swiss banking and tax law differs from U.S. law in material respects. First, unlike U.S. law, Swiss law protects the financial privacy of bank clients, making it a crime to reveal a client's identity to any third party except in limited circumstances. In addition, FINMA can prevent any bank conducting business in Switzerland from continuing its operations if the bank fails to maintain bank secrecy. Swiss bank secrecy applies with the same force to the Swiss tax authority as it does to foreign tax authorities.

In stark contrast to the duties of financial institutions in the United States, as a result of bank secrecy, Swiss banks are generally not allowed to furnish information directly to the Swiss

tax authorities, or to any governmental authorities.  Indeed, Swiss tax law makes clear that the burden is on the individual taxpayer to ensure correct reporting and taxation, and the bank is only obligated to provide supporting documents upon request of the taxpayer; unlike the U.S. 1099 reporting process, there is no process in Switzerland for banks to monitor compliance of Swiss clients or report income earned on these clients' accounts to the Swiss tax authority.  But Swiss bank secrecy is not an absolute.  Tax claims can require the judicial lifting of bank secrecy (and consequently the identification of a client and his account information), depending on the nature of the tax offense.

This leads to a second material distinction between Swiss and U.S. law:  Swiss law distinguishes between tax evasion and crimes of fraud involving taxes.  Tax evasion – the failure to declare certain income or assets – is not a crime in Switzerland (instead being an administrative process between the tax authority and the taxpayer) and does not allow for the lifting of Swiss bank secrecy.  Fraud in connection with taxes, however, is a crime for which bank secrecy may be lifted under Swiss law, but such "tax fraud" is limited to situations where there is an affirmative submission to the authorities of falsified or forged documents (or other like active deceptive action) with the intention of avoiding the payment of tax.  U.S. law makes no such distinctions, treating as felonies both the willful evasion of tax and tax fraud.

### 2.  Wegelin's Offense

During the time period covered by the Indictment, Wegelin opened and maintained bank accounts for U.S. persons who sought to take advantage of Swiss bank secrecy to hide certain assets and thereby evade the assessment of any tax associated with income and gains generated by those assets.  Consistent with Swiss law, Wegelin also acted as a custodian with respect to accounts for U.S. taxpayers that were managed by independent asset managers.  This was a common, and permissible, practice in the Swiss banking industry.  During the relevant period,

independent asset managers based in Switzerland, Liechtenstein and elsewhere opened many accounts for U.S. taxpayers at Wegelin, and other banks, that were intended to be concealed from the IRS.

Although Swiss law requires the exercise of due diligence in opening bank accounts to detect money laundering – which Wegelin followed – there was no requirement under Swiss law to screen for possible tax evaders, much less to refuse to open or to compel the closing of the accounts of such persons.  Consequently, it was Wegelin's policy not to discuss taxes with, or seek to determine the tax compliance of, prospective or existing clients – whether Swiss, U.S. or any other nationality.

Wegelin acknowledges that, despite this policy, on certain occasions, Bank employees learned that a prospective client intended to use, or an existing client was already using, an account at the Bank to evade his U.S. tax obligations and, nonetheless, allowed the account to be opened or maintained.  This was wrong.  Wegelin admits that bank accounts should never have been opened or maintained when Bank employees actually knew they were intended to be used (or were already being used) to evade U.S. taxes.  By opening and/or maintaining these accounts, Wegelin was agreeing to help these U.S. clients evade their tax obligations to the IRS.

In addition, like most Qualified Intermediary banks, Wegelin had two types of clients: those who completed IRS Forms W-9 ("W-9 clients") and those who did not ("non W-9 clients").  During the relevant time period, U.S. clients who chose to invest in U.S. securities or to give their asset managers the authority to do so were required by Wegelin to submit W-9s.  In essence, the W-9 amounts to a waiver of bank secrecy because it identifies the client and authorizes an accounting of his dividend income from U.S. securities to be reported to the IRS.

By contrast, U.S. clients who did not complete W-9s were not permitted to invest in U.S. securities, and did not authorize the Bank to report dividend or other income to the IRS. While these non W-9 clients could still voluntarily declare and pay taxes on their Wegelin accounts, the Bank was aware of the high probability that non W-9 clients who did not request the details of their Wegelin account transactions necessary to prepare U.S. tax declarations were evading their U.S. tax obligations. Thus, in addition to having actual knowledge that a small group of U.S. taxpayers were using their Wegelin accounts to commit tax evasion in the United States, the Bank also knew of the high probability that other U.S. taxpayers who held non W-9 accounts did so for the same unlawful purpose.

Wegelin was aware that U.S. taxpayers had a legal duty to report to the IRS, and pay taxes on the basis of, all of their income, including income earned in accounts that these U.S. taxpayers maintained at Wegelin. Despite being aware of this legal duty, Wegelin intentionally opened and maintained non W-9 accounts for these taxpayers with the knowledge that, by doing so, Wegelin was assisting these taxpayers in violating their legal duties. Wegelin was aware that this conduct was wrong.

However, Wegelin believed that, as a practical matter, it would not be prosecuted in the United States for this conduct because it had no branches or offices in the United States and because of its understanding that it acted in accordance with, and not in violation of, Swiss law and that such conduct was common in the Swiss banking industry. This helps to explain why Wegelin continued to take U.S. clients that came from UBS after it was known that UBS was under investigation. Wegelin wrongly believed that the UBS investigation, and subsequently its Deferred Prosecution Agreement, were premised on UBS's extensive conduct in the United States relating, among other things, to soliciting U.S. clients, see Section III(E), infra, and

because Wegelin did not have comparable activity in the United States, that it would not be subject to a similar investigation.

Wegelin's offense was serious, and the Bank takes full responsibility for its actions, as set forth in detail below. However, we respectfully submit that the Stipulated Fine Amount, as well as the other substantial payments outlined in the Plea Agreement, are sufficient in light of the unusual circumstances of this case, including Wegelin's compliance with its home country's laws, to satisfy the requirements of sentencing under § 3553(a).

### C. The Need For The Sentence To Reflect The Seriousness Of The Offense, Promote Respect For The Law, Provide Just Punishment, Afford Adequate Deterrence, And Protect The Public From Further Crime

Since first learning it was the subject of an investigation by the SDNY, Wegelin has endeavored to work with the U.S. government, within the confines of what is permitted by Swiss law. Indeed, Wegelin committed tremendous resources to ensure that its U.S. lawyers at Goodwin Procter ("Goodwin") were able to provide meaningful information responsive to the government's requests, which Goodwin provided through the course of numerous meetings with the U.S. government over the span of only a few months.

Although consistent with the Bank's efforts to work with the U.S. government, Wegelin's decision to voluntarily come to the United States, accept responsibility for its conduct and enter the plea it entered before this Court is particularly extraordinary for a number of reasons. As set forth below, without Wegelin having taken this remarkable voluntary step, it is unlikely that any criminal judgment against the Bank would be enforceable in Switzerland. Moreover, Wegelin has taken this action despite the fact that the Bank and its managing partners have already suffered dire consequences as a result of this case.

We respectfully submit that Wegelin's decision voluntarily to appear before this Court, accept responsibility for its actions and plead guilty, as well as the Bank's agreement to pay a

substantial total amount pursuant to the Plea Agreement in spite of the devastating financial consequences that it has already suffered as a result of this case, all support the imposition of the Stipulated Fine Amount and the other terms in the Plea Agreement.   Under these facts, a sentence consistent with the Plea Agreement is sufficient – but not greater than necessary – to serve the purposes of sentencing, as it reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence to criminal conduct and protects the public from further crime.  <u>See</u> 18 U.S.C. §§ 3553(a)(2)(A)-(C); <u>see also</u> U.S.S.G. § 8C2.8(a)(1) (directing the court to consider these same factors in determining the appropriate fine amount for an organizational defendant).

      **1.**      **Wegelin's Decision Voluntarily To Appear In This Case And Plead Guilty Supports Imposition Of The Sentence Stipulated In The Plea Agreement**

The fact that Wegelin is here before this Court, having voluntarily come to the United States, accepted responsibility for its conduct and pled guilty, is remarkable.  As set forth above in Section III(A), even the U.S. government has acknowledged the significance of Wegelin's guilty plea in this unprecedented case.  Wegelin's action is particularly extraordinary because without it, it is unclear, at best, whether any legal procedure could allow the U.S. government to force the Bank – a foreign entity with no offices or branches in the United States – to appear in this case.  And in any event, under Swiss law it appears that there would be no mechanism for enforcing any criminal judgment entered against the Bank in this case, even if the proceedings were properly initiated.

Rule 4 of the Federal Rules of Criminal Procedure governs service of process on criminal defendants.  With respect to serving organizational defendants, Rule 4 mandates that the government comply with two separate requirements:  (1) a copy of the summons must be delivered to an agent appointed or legally authorized to receive service of process, which is

sometimes referred to as the "delivery requirement"; and (2) a copy must also be mailed "to the organization's last known address within the district [in which the case is filed] or to its principal place of business elsewhere in the United States," which is sometimes referred to as the "mailing requirement." F.R.Cr.P. 4(c)(3)(C).

Thus, Rule 4 requires that the government satisfy _both_ the delivery requirement and the mailing requirement to effect service of process on, and sufficiently institute a case against, an organizational defendant. See, e.g., United States v. Pangang Group Co., LTD., 879 F. Supp. 2d 1052, 1057 (N.D. Ca. Jul. 23, 2012) ("Under Criminal Rule 4(c)(3), a summons may be served 'on an organization by delivering a copy to an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service of process' (hereinafter 'the delivery requirement'). … The summons must also be mailed 'to the organization's last known address within the district or to its principal place of business elsewhere in the United States' (hereinafter 'the mailing requirement')."); United States v. Alfred L. Wolff GmbH, 2011 WL 4471383, at *3 (N.D. Ill. Sept. 26, 2011) ("In order to effectuate service of process on a corporate defendant in a criminal matter, the government must deliver a copy of the summons to 'an officer, to a managing or general agent, or to another agent appointed or legally authorized to receive service of process.' The government must also mail a copy of the summons to the corporate defendant's last known address within the district, or to its principal place of business elsewhere in the United States.'") (quoting F.R.Cr.P. 4(c)(3)(C)).

While the government may have a different view, Wegelin understood that the government could not satisfy either of Rule 4's delivery or mailing requirements because Wegelin had no offices or branches in the United States. Indeed, on February 2, 2012, when the Superseding Indictment was filed in this Court, the government attempted to effect service of

process on Wegelin by delivering a copy of the Superseding Indictment and a Summons to appear in Court to:  (1) Wegelin's offices in Switzerland; (2) Goodwin's offices in New York; and (3) Corporation Services Company ("CSC"), a Delaware-based entity that acts as agent for service of process for various companies.  But none of these methods of service satisfied the delivery or mailing requirements – which simply are not intended to reach foreign defendants that lack a U.S. presence.

The delivery requirement was not satisfied because Wegelin had no agent appointed or legally authorized to receive service of process on its behalf in the United States.  Service upon Goodwin was not sufficient to satisfy the delivery requirement because Wegelin had not "appointed or legally authorized" Goodwin to receive service of process on the Bank's behalf. See, e.g., Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc., 687 F. Supp. 2d 381, 391 (S.D.N.Y. 2010) ("[T]he fact that an attorney is counsel for a party does not make that attorney the party's agent for service of process.") (citing United States v. Ziegler Bolt and Parts Co., 111 F.3d 878, 881 (Fed. Cir. 1997)).  Likewise, service on CSC did not satisfy the delivery requirement because CSC was also not "appointed or legally authorized to receive service of process" on Wegelin's behalf at the time service was attempted in this case.  Wegelin had previously designated CSC to act as its agent for service of process in the United States, but CSC had discontinued this service for nonpayment in 2005.  Moreover, even when CSC was authorized to act as Wegelin's agent for service of process – which was not the case on February 2, 2012 – this authority was limited to requests for "records related to anti-money laundering programs," and would not have applied to service in this case.  See 31 U.S.C. § 5318(k).  Finally, service on Wegelin in Switzerland did not satisfy the delivery requirement because Rule 4 authorizes delivery outside of the United States only where a federal statute so authorizes – and

the statutes charged in the Superseding Indictment do not themselves have, and do not connect to statutes that have, provisions authorizing service of process abroad.  F.R.Cr.P. 4(c)(2).

The mailing requirement was also not satisfied because Wegelin has no offices or branches in the United States.  See Pangang Group, 879 F. Supp. 2d at 1064-65 (explaining the need to independently satisfy Rule 4's mailing requirement and quashing a summons because the government was unable to satisfy Rule 4's mailing requirement since the foreign company had no place of business in the United States).[6]

As a result, proper service of Wegelin would depend on the availability of service of process through means of international legal assistance.  In April 2012, the U.S. government asked the Swiss government to assist and serve the Summons on Wegelin through the Swiss Federal Act on International Mutual Assistance in Criminal Matters ("IMAC"), which provides an alternative means to serve defendants in Switzerland in certain foreign criminal cases.  In accordance with this request for legal assistance, the Swiss government served Wegelin with a

---

[6]    The U.S. government has informed Probation in response to the Draft PSR that it also mailed a copy of the Summons and Indictment to an apartment in New York.  Wegelin is not independently aware of whether this occurred or not, but, in any event, it does not appear to satisfy Rule 4's mailing requirement.

As an initial matter, Wegelin for a period of time rented an apartment in New York for use by Bank employees who came to New York to receive language training, to take Series 7 exams, or for personal travel.  The apartment was not used by Wegelin to conduct business on behalf of the Bank, was never used as an office, and the Bank cancelled the lease in August 2010 – prior to any knowledge of the current investigation of the Bank and almost 18 months prior to the filing of the Superseding Indictment.

As best we have been able to find, no case has grappled with a similar situation relating to the applicability of Rule 4's mailing requirement to an apartment lease for a foreign corporation, but at least the reasoning of some cases suggests this would not be sufficient to satisfy the mailing requirement since Wegelin was not present in the Southern District of New York – or anywhere in the United States – at the time of the government's attempted service.  See United States v. Johnson Matthey PLC, 2007 U.S. Dist. LEXIS 56510, at *6-7 (D. Utah Aug. 2, 2007) (finding that the government failed to satisfy Rule 4's mailing requirement because the company "has not been shown to be present" in the district and has never had "a place of business within the United States," although not addressing the specific issue of a prior company apartment lease).  See also United States v. Pub. Warehousing Co. K.S.C., 2011 U.S. Dist. LEXIS 32658, at *13 (N.D. Ga. Mar. 28, 2011) (explaining that the government could not satisfy the requirement to serve the organization's last known address in the district because the organization had "never had *an office* in the [district]") (emphasis added); United States v. Chitron Elecs. Co., 668 F. Supp. 2d 298, 306 (D. Mass. 2009) (finding that the government satisfied the "last known address" requirement of Rule 4 because "it was appropriate for the copy of the summons to be sent by certified mail to [the mere conduit subsidiary's] *business address* in [the district]") (emphasis added).

copy of the Summons and Superseding Indictment in May 2012. However, this service also did not compel Wegelin to appear in the United States.

Unlike service under Rule 4, which compels a party to appear in U.S. court, service under the IMAC does not create _any obligation_ on the part of the recipient. The IMAC itself states that: "Whoever accepts a summons to appear before a foreign authority shall be under _no obligation to comply_." IMAC Art. 69(1) (emphasis added), Ex. 3 (excerpt). Indeed, Wegelin challenged the propriety of this service under Swiss law in Swiss federal court based on the IMAC's inapplicability to cases involving tax evasion, but the Swiss court declined to reach the merits of Wegelin's case precisely because it held that the service _did not obligate the Bank to appear in the United States_, and thus the Swiss government's decision to comply with the U.S. government's request for legal assistance was not an appealable final order. See Unofficial Translation of the Decision of the Swiss Federal Criminal Court in Wegelin & Co. v. Federal Office of Justice (the "FCC Decision"), pp.7-8 (May 21, 2012), Ex. 4 ("_[A] person who is not a citizen of the requesting state and does not comply with a summons to appear in the requesting state ... may not be subjected to any harm of a civil or criminal nature or any other sanctions or enforcement_, even if the summons contains threats in that regard. … [T]he execution of a request for service … therefore takes place without the issuance of a final order … and is, accordingly, not subject to appeal. … [T]herefore, it is not necessary to address the appeal on the merits…") (emphasis added).[7] The court explained that according to Article 69, Paragraph 1 of the IMAC, "a person who receives a summons to appear before a foreign authority is _not obligated to comply with such summons_" and that, instead of compelling action, "a summons served by way of judicial assistance always has the exclusive character of an _informal invitation to appear_

---

[7]    The unofficial English translation of the FCC Decision was prepared by Goodwin Procter from the original German court document. The original German court document is attached as Ex. 5.

before the requesting justice authorities."  FCC Decision, p.7, Ex. 4 (emphasis added).  As a result, service under the IMAC did not compel the Bank to appear in U.S. court.

In addition to the problems in initiating the criminal proceedings against Wegelin absent its decision to appear in Court, accept responsibility and plead guilty, we respectfully submit that the government would have had limited means to enforce a monetary judgment against the Bank in Switzerland absent Wegelin's plea.   The enforcement of U.S. criminal judgments in Switzerland is exclusively governed by the IMAC, which does not provide for enforcement of a criminal judgment in a case involving tax evasion.  See IMAC Art. 3(3), Ex. 3 (excerpt).  In fact, following the Indictment in February 2012, Wegelin obtained a legal opinion from one of Switzerland's foremost authorities on the IMAC that made this point even more clear:  there is no Swiss legal provision that allows for the execution of U.S. criminal judgments in matters that involve tax evasion.  As a result, absent Wegelin's acceptance of responsibility and guilty plea, it is highly unlikely that the government would have been able to recover any money from the Bank, let alone the substantial sum that Wegelin has agreed to pay.

Wegelin's actions speak volumes about its meaningful acceptance of responsibility in this case.  Indeed, the Second Circuit has held that a downward departure from the appropriate Guidelines range is warranted where a criminal defendant "breaks the log jam" in a pending case by pleading guilty.  United States v. Garcia, 926 F.2d 125, 126-28 (2d Cir. 1991) (upholding downward departure where the defendant's guilty plea "facilitat[ed] the proper administration of justice in the District Courts," and thus went beyond the "mere acceptance of responsibility" taken into account by the Guidelines).  Wegelin's voluntary appearance in the United States, acceptance of responsibility and guilty plea before this Court likewise goes well beyond the mere acceptance of responsibility that comes from a typical criminal guilty plea; it not only broke a

log jam in this case, but may very well serve to advance the resolution of cases involving other foreign entities and individuals. Wegelin is not seeking a downward departure, but we respectfully submit that a sentence that imposes a higher fine than the parties have agreed would discourage similarly-situated foreign defendants from submitting to U.S. jurisdiction and accepting responsibility for their conduct. On the other hand, we respectfully submit that imposition of the Stipulated Fine Amount and the other terms in the Plea Agreement will appropriately acknowledge the significance of the Bank's decision to appear and plead guilty in this case, will provide just punishment and will make meaningful strides in deterring other criminal conduct. See 18 U.S.C. §§ 3553(a)(2)(A), (a)(2)(B); see also U.S.S.G. § 8C2.8(a)(1).

### 2.  The Dire Consequences That Have Befallen The Bank In The Wake Of The Indictment Support Imposition Of The Sentence Stipulated In The Plea Agreement

Wegelin's involvement with U.S. clients has had a devastating impact on the Bank. Notwithstanding its long history and substantial presence within Switzerland, the Bank could not survive the forces that led ultimately to its Indictment; Wegelin is currently winding down its operations, and exists today only to resolve the charges against it and locate its last few customers in order to close out their inactive accounts.

After the indictment of three Wegelin client advisors on January 3, 2012, rumors attributed to unidentified sources spread rapidly of Wegelin's imminent indictment and likely demise. These rumors, repeated in major Swiss newspapers, set in motion what could only be described as the beginning of the end for Wegelin. Prominent individual and institutional clients, egged on by competitors predicting Wegelin's imminent indictment and collapse, fled to the perceived safety of other financial institutions. It also became clear that crucial counterparties to the financial transactions necessary to keeping the Bank viable would be relieved of their contractual obligations to Wegelin should Wegelin be charged. In addition, key employees were

aggressively targeted for acquisition by other banks, and with their threatened departures would come the additional loss of prized Swiss client relationships.  The loss of clients, employees and counterparties would not only shutter the Bank, but would leave it worthless.

The threat of indictment posed a true Catch-22 for Wegelin.  On the one hand, ignoring the risks and pretending that an indictment was not a real threat would be irresponsible to employees, clients and communities – the overwhelming majority of which had nothing to do with the U.S. business.  And even if the Bank were spared indictment, the inevitable period of extended uncertainty might have a fatal effect on the Bank, leaving it a shell of its former self as its clients and employees fled to competitors.[8]

On the other hand, to heed the signs that the threat of indictment was real and sell the non-U.S. portion of the Bank to save the jobs and business of those who would otherwise be unfairly harmed would likely hasten an indictment – because it would, and did, deprive the Bank of one of the strongest arguments against indictment:  the argument that an indictment would harm the Bank's innocent employees and clients.

Troubled that the flight of clients and employees over the rumors of an indictment would destroy the Bank even if an indictment was not filed, the managing partners entered into negotiations with Raiffeisen Switzerland Cooperative to sell the entirety of Wegelin's non-U.S. business – the vast majority of the Bank's assets.   These arms-length and contentious negotiations eventually led to the sale of the non-U.S. business of Wegelin to Raiffeisen

---

[8]     Indeed, the Bank attempted to assuage concerns and close the floodgates by addressing the issue of a possible indictment head-on in a public press statement following the publication of the rumors that an indictment of the Bank was imminent, in which it attempted to downplay the risk of such action against the Bank.  While this response was an understandable reaction to the fear that clients, counterparties, and employees would all flee the Bank if they believed the Bank could not withstand an indictment, it did not have a meaningful impact in slowing the exodus or quashing the rumors, perhaps because the market understood that a bank today cannot survive a criminal indictment by the United States.

Switzerland Cooperative, an independent and much larger Swiss bank otherwise unconnected to Wegelin.  The transaction was explicitly approved by FINMA and closed on January 27, 2012.

As a result of the decision to sell the part of the Bank not at issue in the U.S. investigation – all of the operations and assets associated with its predominantly Swiss client base – Wegelin is able to pay appropriate compensation for its misconduct in this case, as part of the proceeds from the sale were set aside for that purpose.  Once this case is concluded, and Wegelin has paid its fine and restitution, it will complete the wind-down of its U.S. business and cease to operate as a bank.

Although the sale was able to protect a fair measure of the Bank's value and the jobs of many of its employees, the same cannot be said for the situation of Wegelin's managing partners. The partners' professional reputations have been devastated.  As partners of the only bank thus far to have been indicted for opening accounts for undeclared U.S. taxpayers, they have been singled out in the U.S. as rogues.  For pointing out, in candor, that they followed a common industry practice in Switzerland, they have been openly and heavily criticized in Switzerland. Finally, for the senior managing partners responsible for the Bank's significant growth within Switzerland, the loss of Wegelin also spells an end to what is essentially their life's work.

Wegelin's guilty plea is not an effort to save face in Switzerland and revive its business; the Bank has little to gain from its plea aside from the closure that comes from accepting responsibility and remedying the loss that it caused to the U.S. government.   Nonetheless, because the Bank's managing partners want to accept responsibility and put this case behind them, Wegelin has appeared before this Court and agreed to pay a substantial sum to the U.S. government.  We respectfully submit that imposition of the Stipulated Fine Amount and the other terms of the Plea Agreement, particularly when viewed in light of the devastating impact

this case has already had on the Bank and its partners, will provide just punishment and will afford adequate deterrence.  See 18 U.S.C. §§ 3553(a)(2)(A), (a)(2)(B); see also U.S.S.G. §§ 8C2.8(a)(1), (a)(3) (directing the court to consider any collateral consequences of conviction in determining the appropriate fine amount for an organizational defendant).

Moreover, we respectfully submit that this substantial fine amount is sufficient, and a higher fine is not warranted, to protect the public from any further crimes – of which we respectfully submit there is no future risk, as Wegelin is ceasing operations as a Bank.  See 18 U.S.C. § 3553(a)(2)(C); see also United States v. Stewart, 590 F.3d 93, 141 (2d Cir. 2009) (finding that a court cannot "properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence," and holding that the district court properly determined that the "need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant").  The general deterrent effect of Wegelin's prosecution is beyond question; no foreign bank will be encouraged by the result of this case to engage in similar misconduct.  Indeed, the government's own press release cited above is the best evidence that it, too, believes that the conviction of Wegelin, alone, is sufficient general deterrence.

### 3.  The Total Amount Of Money Wegelin Has Agreed To Pay Supports Imposition Of The Sentence Stipulated In The Plea Agreement

As part of its Plea Agreement in this case, Wegelin has agreed to pay nearly *$75 million* in restitution, fine and forfeiture.  This amount represents a substantial total recovery for the U.S. government – particularly in light of the unique circumstances of the case and the Bank's significant acceptance of responsibility, as set forth above.  We respectfully submit that in light of these factors, the Stipulated Fine Amount more than adequately serves the purposes of punishment – it sufficiently reflects the seriousness of the offense in this case, promotes respect

for the law, provides just punishment, and affords adequate deterrence. See 18 U.S.C. §§ 3553(a)(2)(A)-(C); see also U.S.S.G. § 8C2.8(a)(1). We respectfully further submit that imposing a higher fine above what the parties have agreed goes well beyond what is necessary in this case.

As part of the total payment Wegelin has agreed to make under the Plea Agreement, Wegelin has agreed that it will forfeit to the U.S. government $15,821,000, which represents the gross _revenues_ that Wegelin earned from U.S. taxpayers with undeclared accounts – significantly more than Wegelin's net profits earned as a result of its offense. Although it is not possible to generate an exact figure to represent the profits that Wegelin earned from non W-9 U.S. clients, as Wegelin did not keep reports with respect to profits earned from these, or any, clients, Wegelin has calculated an estimated profit figure of approximately $5.2 million, which is based on applying the Bank's overall profit and loss ratios per year to the gross fees received from non W-9 U.S. clients. Thus, Wegelin has agreed to forfeit more than three times its total profits. Indeed, Wegelin consented to and made this forfeiture on January 4, 2013, the day after this Court accepted the Bank's guilty plea. We respectfully submit that these facts further support the imposition of the Stipulated Fine Amount, which more than sufficiently serves the purposes of punishment. See 18 U.S.C. § 3572(a)(5) (stating that one factor the court shall consider in determining the appropriate fine amount is "the need to deprive the defendant of illegally obtained gains from the offense").

Moreover, the Sentencing Guidelines state that the Court may also consider the importance of "the pecuniary gain from the offense" when determining the appropriate sentence. U.S.S.G. § 8C2.8(b). Where, as here, Wegelin is agreeing to make a total monetary payment of more than 10 times its net profit from the offense, we respectfully submit that the fine should

appropriately reflect such a concession.  Indeed, one of the bases for a downward departure is when the remedial costs that the organization has agreed to pay greatly exceed the gain.  The Guidelines recognize that in some cases, the defendant's payment in restitution and fine could so greatly exceed its gain that a "substantial fine may not be necessary in order to achieve adequate punishment and deterrence."  U.S.S.G. § 8C4.9.  Wegelin is not seeking a downward departure and has agreed that the $22,050,000 Stipulated Fine Amount is appropriate – indeed, it is substantial – but we respectfully submit that this fine is more than sufficient to serve the purposes of sentencing in this case when viewed in light of Wegelin's actual profit from the offense – even more so when taking into consideration the substantial total payment that Wegelin has agreed to make.  See 18 U.S.C. §§ 3553(a)(2)(A)-(C); see also U.S.S.G. § 8C2.8(a)(1).[9]

Finally, it is also significant that Wegelin has agreed to seek no credit for the $16,290,693.42 that the Bank previously forfeited to the United States pursuant to a final order of forfeiture in April 2012.  Indeed, not only has the Bank sought no credit for this prior forfeiture as part of its guilty plea before Your Honor, but in fact, Wegelin decided to forego any challenge to the seizure of these funds in an effort to demonstrate its willingness to accept responsibility and reach a negotiated resolution in this case.  We respectfully submit that this action, along with Wegelin's agreement to make an additional forfeiture of its gross revenues and pay the full amount of tax loss in restitution with no credit for payments from the taxpayers themselves, merits the Court's acceptance of the Stipulated Fine Amount.

---

[9]     If a fine of more than the Stipulated Fine Amount were to be imposed, the parties have agreed to ask the Court to apply the $15,821,00 Forfeiture Amount as an offset, or credit, toward the higher fine, up to the statutory maximum fine amount.  See Wegelin Plea Agreement, p.6, Ex. 2.  The agreement to seek such an offset or credit reflects the parties' joint view that the substantial total monetary payment Wegelin has agreed to make as part of the Plea Agreement – which is the result of the parties' comprehensive negotiations – is a fair and reasonable resolution of this unprecedented case.

**D.**      **The Need To Provide Restitution To Victims Of The Offense**

In addition to the importance of the substantial total amount of money that Wegelin has agreed to pay under the Plea Agreement in this case, in determining the correct sentence, the Court is specifically directed to consider "whether restitution is ordered or made and the amount of such restitution." 18 U.S.C. § 3553(a)(7); see also 18 U.S.C. § 3572(a)(4) (same). Wegelin has agreed to pay restitution in the amount of $20,000,001. It has also agreed not to seek any credit or apportionment for *either* the actual tax losses the government has already recovered from former Wegelin clients who have participated in the Voluntary Disclosure Program *or* future recovery of tax losses that the government may obtain from the remaining Wegelin clients who have not yet, or may never, participate in the Voluntary Disclosure Program. Since $20,000,001 is a reasonable estimate of the actual tax loss in this case, it is also the appropriate figure to use for purposes of ordering restitution.

**1.**      **A Comparison Of The Fees That Wegelin Received For Servicing Its Non W-9 Clients To The Agreed-Upon Tax Loss Supports Finding That The Agreed-Upon Tax Loss Is Reasonable**

As explained briefly during the plea hearing on January 3, 2013, the fees paid to Wegelin include custody fees and transaction fees that are standard charges at banks that manage investment accounts for high-net-worth clients. See Transcript of Plea Hearing at 11:23-13:16, United States v. Wegelin & Co., 12 CR 02 (JSR) (Jan. 3, 2012), Ex. 1. The non W-9 U.S. clients were not paying fees to Wegelin as an alternative to paying their taxes; rather, they were paying fees to Wegelin for the services that Wegelin provided in managing their accounts – fees any wealth manager would have charged irrespective of whether the funds were declared or not. In other words, these clients were paying fees to Wegelin and evading their taxes, as opposed to keeping their money at a bank in the United States and paying both amounts. Thus, the amount

of fees paid to Wegelin in connection with these accounts does not undermine the reasonableness of the agreed-upon tax loss.

Moreover, given that both fees and tax loss are linked to the total AUM of Wegelin's non W-9 U.S. accounts, it is not surprising that the total fees and estimated tax loss figure are relatively comparable. Bank fees generally are based on a percentage of the total value of AUM. Taxes are imposed on income earned on the assets, and are thus a percentage of income, which itself is typically a percentage of the value of the assets. In fact, Wegelin charged fees that were typically less – and often substantially less – than many other competitor banks. But Wegelin did not have any differences in the types of fees it charged to U.S. versus non-U.S. clients; all Wegelin clients with the same types of accounts were charged the same fees for the same services.

Finally, the Deferred Prosecution Agreement negotiated in the UBS case (the "UBS DPA") supports the idea that the fee-tax loss ratio proposed by the plea agreement is reasonable. UBS paid $380 million in disgorgement of profits and $400 million in tax loss. UBS DPA ¶ 3, available at http://www.justice.gov/tax/UBS_Signed_Deferred_Prosecution_Agreement.pdf. In other words, its profits were 95% of the tax loss attributed to its clients [e.g., $ 380 million disgorgement ÷ $ 400 million in tax loss = 95%].

### E.    The Need To Avoid Unwarranted Sentencing Disparities

In determining the correct sentence, the Court must consider "the need to avoid unwarranted sentenc[ing] disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). As we will describe in detail below, Wegelin compares favorably with UBS, which was not only spared indictment and permitted to enter into a Deferred Prosecution Agreement, but which paid a proportionately similar – if not

_lower_ – amount to the U.S. government for its offense, despite having engaged in more extensive violations and having caused greater harm.[10]

The first and most obvious distinction between Wegelin and UBS is that UBS did not plead guilty to any offense. Wegelin, of course, has pleaded guilty and, to date, remains the only Swiss bank to have done so.

Next, when comparing Wegelin's conduct to UBS's conduct, the disparity in volume is striking. Considering both those accounts that Wegelin opened and maintained for U.S. taxpayers and the accounts that Wegelin permitted independent asset managers to open and maintain, Wegelin had 89 non W-9 accounts in 2002 – a number that grew to 684 non W-9 accounts at its peak. The size and scope of UBS's U.S. business was larger by several orders of magnitude and, as a result, resulted in far greater loss to the U.S. government. Indeed, the UBS DPA cites varying figures of the bank's total number of non W-9 clients that range from 11,000 on the low end to as high as 17,000. See UBS DPA, Information ¶ 4; UBS DPA, Statement of Facts ¶ 8.

Second, UBS also admitted knowledge that its U.S. business was not conducted in a manner that complied with the terms of the Qualified Intermediary ("QI") Agreement that it entered into with the IRS. Specifically, UBS admitted that it _intentionally circumvented its QI obligations_ by helping U.S. clients "form offshore companies in order to enable such clients to _evade the U.S. securities investment restrictions_ in the QI Agreement." See UBS DPA, Statement of Facts ¶ 11 (emphasis added). UBS admitted that it "assisted such U.S. clients in

---

[10]    As noted above, see supra n.3, the government justified the reasonableness of tax loss amount to which the parties have agreed – an amount that drives the sentencing guidelines calculation of the fine and the determination of the appropriate amount of restitution – based in part on the very fact that this amount was _proportional_ to the tax loss that UBS admitted in connection with its 2009 Deferred Prosecution Agreement. Moreover, as we understand the government's extrapolation from this UBS data, while it supports that $20,000,001 is a reasonable estimate of the tax loss in this case, it indicates that this amount is at the higher end of the extrapolated tax loss.

creating and maintaining *sham, nominee or conduit offshore companies* … that enabled such clients to *conceal their investments in U.S. securities*, and thereby evade UBS's obligation to provide tax information reporting" under the QI Agreement.  UBS DPA, Statement of Facts ¶ 11, (emphasis added).  Specifically, UBS created structures for pre-existing clients who had not previously had them, explicitly in order to subvert the QI Agreement's restriction against undeclared U.S. taxpayers holding U.S. securities.  See EBK Investigation of the Cross-Border Business of UBS AG with its Private Clients in the USA:  Summary Report (the "FINMA Summary Report"), p.11 (Feb. 18, 2009), available at http://www.finma.ch/d/aktuell/Documents/kurzbericht-ubs-x-border-20090218-e.pdf ("individual client advisors not only referred their clients to selected providers of Non-Flow-Through structures, but also actively advised them beforehand, accompanied them to visit such providers or even arranged to meet the client with the provider in the USA").  In addition, UBS advised other clients to change the form of pre-existing structures so that they could circumvent the QI Agreement.  See FINMA Summary Report, p.11.  The UBS DPA makes clear that these entities were "sham" entities because they did not "respect corporate formalities."  UBS DPA, Statement of Facts ¶ 11.

Essentially, UBS admitted having helped clients create sham offshore entities so that the clients' accounts could be held in the names of the entities – and not the U.S. taxpayers – to allow these clients to hold U.S. securities in a manner that UBS would not have to report under the QI Agreement.  UBS did so despite its awareness that such conduct "might be viewed as actively helping such clients to engage in tax evasion."  UBS DPA, Statement of Facts ¶ 11.  The crux of the QI Agreement's reporting requirements concern clients that hold U.S. securities, and likewise, the crux of UBS's violation in this regard was that it allowed U.S. clients to *hold U.S.*

*securities without having to be reported*.  See UBS DPA, Statement of Facts ¶¶ 2, 9-12.  In fact, as part of its payment to the U.S. government in connection with its DPA, UBS appears to have paid restitution for backup withholding that was earned on U.S. securities associated with this intentional circumvention of the QI Agreement.  See UBS DPA ¶ 3.  UBS also agreed to implement enumerated procedures to ensure compliance with its obligations under the QI Agreement going forward.  See UBS DPA ¶ 6.

This kind of flouting of U.S. obligations under the QI Agreement was simply not done at Wegelin.  As an initial matter, nearly 70% of the non W-9 accounts held at Wegelin were held by natural U.S. persons.  The remaining 30% were opened for U.S. persons in the names of offshore companies and foundations, including entities organized under the laws of Panama, Hong Kong and Liechtenstein, among other places.  While Wegelin acknowledges and admits that it opened and maintained accounts for such offshore entities with the knowledge that many of the accounts would be used to evade U.S. tax, the Bank did not do so for the added purpose of circumventing the restrictions against non W-9 clients investing in U.S. securities.  Although there were occasional exceptions, offshore entities beneficially owned by U.S. persons were generally restricted from buying U.S. securities at Wegelin.  In fact, Wegelin was nearly 99% compliant in obtaining a Form W-9 from *all* U.S. clients who invested in U.S. securities, including those U.S. clients who opened accounts in the names of offshore entities.

Nor, as far as Wegelin knew and understood, did these offshore entities constitute shams.  Overwhelmingly, the corporate form of these offshore entities was respected at Wegelin and the Bank required the management and disposition of the assets in these accounts to be handled by the officers authorized to do so under the company's documents.  It was Wegelin's policy to require adherence to the formalities of the corporate form – not to tolerate its breach.

Wegelin took its compliance responsibilities seriously and had only rare instances of a U.S. client holding U.S. securities without being documented via a Form W-9, or of a U.S. client improperly directing activity in an account held in the name of an offshore entity. Wegelin was trying to "get it right" and was not attempting an end-run around the obligations of the QI Agreement.

Third, UBS engaged in offshore banking onshore in the United States. In particular, the frequency and nature of UBS travel to the U.S. was substantial. In 2004 alone, UBS bankers from Switzerland traveled to the U.S. to meet with clients approximately _3,800 times_. See UBS DPA, Information ¶ 36; UBS DPA, Statement of Facts ¶¶ 3, 6. In fact, as part of its DPA, UBS made a $200 million payment to the SEC for providing unlicensed securities advisory services to U.S. clients – a clear case of UBS having subjected itself to U.S. jurisdiction by its extensive conduct on U.S. soil. In contrast, Wegelin did not have operations in the United States and did not have considerable and improper travel of scores of client advisors soliciting U.S. clients on U.S. soil. Although the Bank acknowledges that some employees did travel to the United States, and that in a few instances these trips involved interactions with clients, the nature of this travel is simply on a different scale; during the 11 years between 2000 and 2010, Wegelin bankers took a total of 19 trips to the U.S. during which there was any interaction with any client, including trips that involved purely social visits and trips that involved meetings with non-U.S. clients. Wegelin's volume of travel to the U.S. was de minimis, and pales in comparison to the thousands of trips taken by UBS personnel.

Finally, both the U.S. government and the Swiss regulators criticized UBS's policy of growing its U.S. business through aggressive monetary incentives. UBS admitted that its executives and managers "put in place monetary incentives that rewarded Desk Heads and

Bankers who increased the United States cross-border business," which reportedly encouraged bankers to aggressively pursue U.S. clients.  See UBS DPA, Information ¶ 17; UBS DPA, Statement of Facts ¶ 5.  FINMA likewise reported that UBS's monetary incentives had the effect of degrading the bank's compliance efforts, because "the criterion of net new money became the most important factor for the participation in the bonus pool."  FINMA Summary Report, p.13. By contrast, Wegelin did not prioritize the growth of its U.S. client base; it never even had a formalized U.S. business.  Similarly, Wegelin management did not pressure Bank personnel to increase the number of U.S. clients.  Unlike UBS and many other banks, Wegelin did not have a compensation structure that incentivized obtaining clients or increasing assets under management.  Instead, Wegelin's culture encouraged client advisors to develop long-term relationships with clients.

We respectfully submit that the considerable fine that Wegelin has agreed to pay – which is proportionately similar to the fine that UBS paid for its more extensive violations of U.S. law – is appropriate in order to avoid unwarranted disparities.  In fact, not only are these distinctions relevant in determining the appropriate sentence in this case, but they also go to the heart of understanding a component of Wegelin's conduct in this case:  its acceptance of former UBS U.S. clients.  Wegelin, like the rest of the Swiss banking industry, was aware of the U.S. investigation of UBS and ultimately the UBS DPA.  Despite this awareness, however, Wegelin approved the opening of these non W-9 accounts based on its incorrect belief that these significant distinctions between UBS's misconduct and Wegelin's own conduct with respect to U.S. clients were dispositive, especially UBS's active involvement with U.S. clients in the U.S. Wegelin viewed the UBS case as *dependent* on the very conduct that set UBS apart from Wegelin.  Wegelin acknowledges that its understanding of the UBS case was mistaken.

IV.    <u>**PROBATION IS NOT WARRANTED IN THIS CASE**</u>

In determining the appropriate sentence to impose upon an organizational defendant, probation is required only when it is:  (1) necessary to ensure the organization's compliance with the sentence imposed on it, including specifically payment of any monetary penalty; (2) necessary to prevent or reduce the likelihood of future misconduct on the part of the organization or its personnel; or (3) necessary to accomplish one or more of the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).    U.S.S.G. §§ 8D1.1(a)(1)-(6), (8); <u>see also</u> <u>id.</u> Ch. 8, Introductory Commentary ("[P]robation is an appropriate sentence for an organizational defendant when needed to ensure that another sanction will be fully implemented or to ensure that steps will be taken within the organization to reduce the likelihood of future criminal conduct.").  We respectfully submit that none of these circumstances apply to Wegelin in this case, and thus a sentence of probation is not warranted.[11]

First and foremost, probation is not necessary to ensure that Wegelin complies with the sentence to be imposed in this case.  <u>See</u> U.S.S.G. §§ 8D1.1(a)(1)-(2).  As discussed at length above, in this unprecedented case Wegelin has voluntarily appeared in U.S. court, accepted responsibility for its offense and agreed to plead guilty before this Court pursuant to a Plea Agreement under which it agreed to pay a considerable sum to the U.S. government.  We respectfully submit that these extraordinary circumstances attest to Wegelin's organizational character, including its respect for U.S. law, and also demonstrate the Bank's commitment to paying for its offense and making right the wrong that it allowed to be committed against the United States.  We respectfully submit that in light of such a commitment, probation is not needed to ensure that the Bank complies with the sentence this Court imposes upon it.

---

[11]    Probation is also deemed mandatory if the sentence imposed upon the organization does not include a fine.  U.S.S.G. § 8D1.1(a)(7).  We respectfully submit that this provision also does not apply in this case, as Wegelin has agreed to pay a considerable fine as part of its Plea Agreement, as set forth above.

In addition, there is no reason to believe that a period of probation is necessary to ensure that Wegelin will comply with its commitment to pay the monetary penalty imposed by this Court.  Wegelin has set aside funds for the purpose of making payment to the U.S. government in connection with sentencing and has committed to pay the full Restitution Amount, as well as any fine imposed by the Court, within three days after the imposition of sentence.  See Wegelin Plea Agreement at pp.1, 5, Ex. 2.  In fact, the Bank forfeited to the U.S. government the full amount of its gross fees earned from undeclared U.S. clients from 2002-2010 – a sum of nearly $16 million – just one day after this Court accepted Wegelin's guilty plea and two days _ahead_ of the requirement in the Plea Agreement.  Wegelin is committed to paying its remaining monetary obligations as soon as they are imposed.

Second, probation is not necessary to prevent or reduce the likelihood of future misconduct on the part of Wegelin or its personnel.  See U.S.S.G. §§ 8D1.1(a)(3)-(6).  As set forth above, Wegelin is an entirely foreign entity subject to its own governmental authorities.  Moreover, Wegelin is winding down its operations and exists today only to close out its last remaining accounts.  There is no real danger of potential future misconduct when an organization is defunct, and therefore probation is not warranted as a means to protect against this nonexistent risk.  See, e.g., Transcript of Sentencing Hearing at 19:19-20:2, 98:16-104:23; 106:14-20, United States v. Habibion, et al., No. CR 11-118 (D.C. Cir. May 16, 2012), Ex. 6 (excerpt) (ordering probation for a minimal duration only to ensure the entity's payment of the sentence, after discussing at length the fact that probation would otherwise be unwarranted given that the company was no longer engaged in any business, as there would be nothing for probation to monitor and imposing probation would constitute a waste of valuable resources); Sentencing Memorandum of the United States, United States v. Bezonsky et al., No. 06-394-06, 2007 WL

5032787, *5 (E.D. Pa. May 18, 2007), Ex. 7 ("[T]his corporation is defunct. _No conditions of probation will have any effect on its future activity because there will be no future activity_.") (emphasis added).  Indeed, the government has explained that probation is not needed for this purpose even for an operational company, when that company also poses no real risk of future misconduct.  See Sentencing Memorandum of the United States, United States v. Genentech, Inc., No. CR-99-0141, 1999 WL 33740505, *1 (N.D. Cal. May 3, 1999), Ex. 8 ("[T]he parties have agreed that since [the corporation's] criminal conduct ceased in 1994 and it has undertaken significant remedial measures, _a sentence of probation would serve no useful purpose_.") (emphasis added).  We respectfully submit that probation is not needed as a mechanism to monitor Wegelin, an all-but-defunct organization that poses no risk of future misconduct.

Third, we respectfully submit that probation is also not necessary to serve any of the additional purposes of sentencing articulated in 18 U.S.C. § 3553(a).  See U.S.S.G. § 8D1.1(a)(8).  As set forth in detail in Section III of this memorandum, the substantial total payment that Wegelin has agreed to make as part of the Plea Agreement it entered in this case amply satisfy the purposes of sentencing.  Wegelin has continued to demonstrate its meaningful acceptance of responsibility, and we respectfully submit that a sentence of probation – particularly when ordered on top of the significant monetary penalties – will impose unnecessary logistical difficulties on the Bank as it attempts to wind down its business.

Finally, as a purely practical matter, the current state of the budget for the United States Probation Office militates against imposing on the Probation Office an additional burden – however small – that will serve no meaningful purpose.

V.    **CONCLUSION**

Wegelin deeply regrets its involvement in helping U.S. taxpayers evade their U.S. tax obligations and accepts responsibility for this grave misstep.  We respectfully submit that the unique nature and circumstances of this case, Wegelin's extraordinary decision to appear before this Court, accept responsibility for its actions and make a substantial payment of restitution, criminal fine and forfeiture of its gross revenues, and the devastating financial consequences the Bank has already suffered as a result of this case, support that the sentence to which the parties have agreed is reasonable and sufficient under the statutory sentencing requirements.  We respectfully request that the Court accept the considerable sentence to which the parties have agreed, and impose sentence consistent with the Plea Agreement, including restitution in the amount of $20,000,001 and a criminal fine in the amount of $22,050,000.


Dated:        February 25, 2013

                                                  Respectfully submitted,

                                                  Goodwin Procter LLP

                                                  By: /s/ Richard M. Strassberg
                                                  Richard M. Strassberg
                                                  Anne E. Railton
                                                  Valerie A. Haggans
                                                  The New York Times Building
                                                  620 Eighth Avenue
                                                  New York, New York 10018
                                                  Tel: (212) 813-8800
                                                  Fax: (212) 355-3333
                                                  rstrassberg@goodwinprocter.com

                                                  John Moustakas
                                                  901 New York Avenue, NW
                                                  Washington, D.C. 20001
                                                  Tel.: (202) 346-4000
                                                  Fax: (202) 346-4444
                                                  jmoustakas@goodwinprocter.com