**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

v.                                                    Case No: S1 12 Cr. 02 (JSR)

WEGELIN & CO., et al.

---

<u>**WEGELIN & CO.'S REPLY TO THE**</u>
<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

*Attorneys for Wegelin & Co.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  THE GOVERNMENT'S TAX LOSS ESTIMATION SUPPORTS THAT $20,000,001 IS A REASONABLE – ALBEIT AGGRESSIVE – APPROXIMATION OF THE ACTUAL TAX LOSS .......................................................1

II.  IN LIGHT OF THE UNIQUE CIRCUMSTANCES OF THIS CASE, THE COURT SHOULD DECLINE TO IMPOSE A PERIOD OF PROBATION ...................6

III.  CONDUCT THAT THE GOVERNMENT DEEMS "EXTRAORDINARILY WILLFUL" WAS THE NATURAL CONSEQUENCE OF AGREEING TO ACCEPT CLIENTS IRRESPECTIVE OF THEIR TAX STATUS.................................9

  A.  Wegelin Did Not Actively Assist Clients In Creating Sham Structures To Circumvent The IRS's Qualified Intermediary Agreement..................................10

  B.  Wegelin's Use Of Its U.S. Correspondent Bank Account ....................................16

  C.  Wegelin's Directives Restricting Communications With U.S. Clients ................16

  D.  Wegelin's Acceptance Of Former UBS U.S. Clients ...........................................18

  E.  Wegelin's Belief That It Acted In Accordance With, And Not In Violation Of, Swiss Law, Is Consistent With Accepting Responsibility..............................22

IV.  CONCLUSION....................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

STATUTES

18 U.S.C. § 3553(a) ...................................................................................................1, 23

U.S.S.G. § 8D1.1 ..............................................................................................................7

OTHER AUTHORITIES

EBK Investigation of the Cross-Border Business of UBS AG with its Private Clients in the USA:  Summary Report (Feb. 18, 2009), available at http://www.finma.ch/d/aktuell/Documents/kurzbericht-ubs-x-border-20090218-e.pdf..........12

In the Country Where Tax Evasion Is No Crime, Swiss Private Banks Are Unrepentant About Siphoning Off Other Governments' Income, The Guardian (Feb. 4, 2009), available at www.guardian.co.uk/business/2009/feb/05/tax-gap-avoidance-switzerland.. ....................................................................................................................12

IRS Notice 2001-4, 2001-2 I.R.B. 267 available at www.irs.gov/pub/irs-drop/n-01-4.pdf. .........15

Joint Committee on Taxation, General Explanation of Tax Legislation Enacted in the 111 Congress, Part VII, Revenue Provisions of the Hiring Incentives to Restore Employment Act, P.L. 111-147, Title V.A., Foreign Account Tax Compliance, JCS-2-11 (March 2011).................................................................................................................14

QI Agreement, Rev. Proc. 2000-12, 2000-4 I.R.B. 387, available at www.irs.gov/pub/irs-drop/rp-00-12.pdf...................................................................................................13, 14

Reports of Foreign Financial Accounts, 76 Fed. Reg. 10,245, 10,246 (Feb. 24, 2011) (codified at 31 C.F.R. § 1010.350(e)(3).................................................................................11

"Tax Haven Banks And U.S. Tax Compliance:  Obtaining The Names Of U.S. Clients With Swiss Accounts," Transcript of Senate Hearing Before The Permanent Subcommittee On Investigations Of The Committee On Homeland Security And Governmental Affairs, S. Hrg. 111-30 (Mar. 4, 2009) ..................................................20

Transcript of Sentencing Hearing, United States v. Habibion, et al., No. CR 11-118 (D.D.C. May 16, 2012) ...............................................................................7

Unofficial Translation of Andreas Flütsch, UBS Management Knew Exactly What They Were Doing, TAGES-ANZEIGER, Feb. 20, 2009 ...................................................................18

Unofficial Translation of Lukas Hässig, Miami Vice, SONNTAGSZEITUNG, Jul. 12, 2009 ............18

Unofficial Translation of Lukas Hässig, Negotiations For UBS Failed, SONNTAGSZEITUNG, Jun. 22, 2008 ........................................................................................19

Unofficial Translation of Lukas Hässig, <u>The United States Want[s] The Names Of 10,000 UBS Clients</u>, SᴏɴɴᴛᴀɢsZᴇɪᴛᴜɴɢ, Jul. 26, 2009 ...................................................................18

Unofficial Translation of Lukas Hässig, <u>UBS Client Data Will Be Disclosed To U.S. Authorities Soon</u>, SᴏɴɴᴛᴀɢZᴇɪᴛᴜɴɢ,  Oct. 26, 2008............................................................19

Unofficial Translation of Lukas Hässig, <u>U.S. Unhinge Banking Secrecy</u>, Sᴘɪᴇɢᴇʟ Oɴʟɪɴᴇ, Jun. 20, 2008............................................................................................18

Unofficial Translation of Lukas Hässig, <u>Why UBS Is Sacrificing The Principle Of Banking Secrecy</u>, Zᴇɪᴛ Oɴʟɪɴᴇ, Feb. 20, 2009 ...............................................................19

Wegelin & Co. Private Bankers ("Wegelin" or the "Bank") respectfully submits its Reply to the Government's Sentencing Memorandum. Wegelin concurs in the Government's assessment that the almost $75 million in total payments agreed to by Wegelin amounts to a very substantial sentence in this case. Indeed, under the applicable statutory framework (18 U.S.C. § 3553(a)), Wegelin respectfully submits that this sentence is a fair and reasonable one, and that any higher sentence would be greater than necessary to comply with the purposes of sentencing. Wegelin also respectfully submits that no period of probation is necessary or advisable in this case, other than perhaps a nominal one, given that Wegelin is a foreign bank that is presently winding down its operations under the supervision of its domestic regulator, and has committed to insuring that payment of its fine, restitution and special assessment occurs immediately following their imposition by the Court. Wegelin also writes to clarify and provide context for certain of the assertions made in the Government's Sentencing Memorandum ("Gov't Mem."), and in the Final Presentence Investigation Report ("Final PSR").[1]

I.  **THE GOVERNMENT'S TAX LOSS ESTIMATION SUPPORTS THAT $20,000,001 IS A REASONABLE – ALBEIT AGGRESSIVE – APPROXIMATION OF THE ACTUAL TAX LOSS**

Pursuant to its guilty plea in this case, Wegelin admitted that its agreement to assist U.S. taxpayers in evading their U.S. tax obligations resulted in a gross pecuniary loss to the Internal Revenue Service ("IRS") of $20,000,001, and agreed to make restitution to the United States in

---

[1]   As a result of the expedited sentencing schedule in this case, many of Wegelin's Objections and Responses to the Draft PSR were not reflected in the Final PSR. Indeed, the information in Part A of the Final PSR ("The Offense") came almost entirely from the Indictment and the Civil Forfeiture Complaint, and a good deal of that and other information included in the Final PSR was added after the Draft PSR was distributed to the parties. Wegelin cannot confirm the allegations regarding third-parties in the Final PSR, but has otherwise attempted to identify any other material objections to the Final PSR in its sentencing submissions.

this amount (the "Restitution Amount").  See Wegelin Plea Agreement at p.1, Wegelin Mem. Ex. 2.  As an initial matter, this figure was proposed by the Government as a reasonable estimate of the actual tax loss that it suffered as the victim in this case.  Wegelin agrees that the $20,000,001 figure is a reasonable – albeit aggressive – estimate of the actual tax loss caused by Wegelin's conduct.  The Government's explanation of the tax loss figure, including the extrapolation from voluntary disclosure payments and the UBS case, supports a finding that the $20,000,001 figure is fair and reasonable.  See Gov't Mem. at 18-21.

The Government's calculations, however, overstate, in some cases by a substantial amount, the likely unpaid tax loss attributable to Wegelin's conduct.  First, with respect to the voluntary disclosure extrapolation, the $13.3 million in back taxes and interest paid by the 245 taxpayers who had undeclared accounts at Wegelin and who participated in the voluntary disclosure program substantially overstates the amount of taxes and interest attributable to Wegelin's conduct, because it includes payments by taxpayers who had undeclared accounts at other banks, as well as Wegelin.

According to the Government, "245 U.S. taxpayers who had undeclared accounts at Wegelin … have participated in the voluntary disclosure program [and] paid back taxes and interest of approximately $13.3 million."  Gov't Mem. at 19.  While we have not had access to the voluntary disclosure data, the Government confirmed to us that this number includes the gross payments of taxes and interest made by taxpayers who had undeclared accounts at Wegelin and at other banks.  Because many of Wegelin's undeclared accounts were only opened in 2008 or 2009, and because many of these clients came from UBS and other Swiss banks where they had maintained undeclared accounts for years, and in some cases, generations, the taxes and

2

interest they paid as part of the voluntary disclosure program likely includes substantial amounts that are unrelated to Wegelin.

Thus, assuming, for example, that a hypothetical U.S. taxpayer paid $80,000 in back taxes and interest with respect to undeclared funds held for six years at UBS and two years at Wegelin, attributing the entire $80,000 to the tax loss caused by Wegelin and $0 to UBS would plainly overstate Wegelin's responsibility for that tax loss.  (Assuming that unpaid taxes and interest were evenly distributed throughout the period, $60,000 should correctly be attributed to UBS, and only $20,000 to Wegelin.)  Thus, we respectfully submit that a fair extrapolation of the voluntary disclosure data relating to Wegelin clients does not support finding that the tax loss attributed to Wegelin was anywhere near as high as $37.15 million, the amount listed in paragraph 59 of the Final PSR.  See Final PSR ¶ 59.  Instead, we submit that these numbers suggest the actual tax loss attributed to Wegelin's conduct is likely to be much lower, and that the $20,000,0001 figure Wegelin agreed to pay as restitution is likely reflective of the very top of any reasonable estimation of that range.

In addition to the extrapolation from the voluntary disclosure data, the Government also outlined a secondary "check on this estimation," based on an extrapolation from the tax loss payment extracted from UBS in connection with its February 2009 DPA.  See Gov't Mem. at 20.  Wegelin agrees that this extrapolation supports finding that the tax loss and restitution number Wegelin agreed to pay is reasonable, albeit aggressive, but this extrapolation, as calculated by the Government and in the Final PSR, also overstates the tax loss attributable to Wegelin.  See Gov't Mem. at 20-21; Final PSR ¶ 59.  The Government proposes multiplying the per-account per-year tax loss amounts attributable to UBS "by the maximum number of undeclared accounts at Wegelin (684) and the number of years at issue in the case of Wegelin."  See Gov't Mem. at

20.   However, this proposal assumes that Wegelin maintained 684 non W-9 accounts each year over the relevant period for which it has admitted wrongdoing.  As the Government noted earlier in its own sentencing brief, that is not the case, <u>see</u> Gov't Mem. at 7; the number of U.S. client accounts at Wegelin was quite small throughout most of the time period at issue in the case, and only began to grow during the last few years, starting in 2008.

A more accurate estimate would apply the figures calculated by the Government as reflecting the tax loss per year, per account at UBS to the actual number of non W-9 accounts at Wegelin each year.  This more detailed calculation, and the total results for this extrapolation based upon UBS having either 11,000 or 14,000 accounts, is reflected below:

| Year | Number of Non W-9 Wegelin Accounts | UBS Per-Account, Per-Year Multiplier, Assuming 14,000 UBS Accounts | Extrapolated Tax Loss Attributable to Wegelin |
|------|------|------|------|
| 2002 | 89 | $3,571 | $ 317,819 |
| 2003 | 143 | $3,571 | $ 510,653 |
| 2004 | 167 | $3,571 | $ 596,357 |
| 2005 | 195 | $3,571 | $ 696,345 |
| 2006 | 217 | $3,571 | $ 774,907 |
| 2007 | 252 | $3,571 | $ 899,892 |
| 2008 | 558 | $3,571 | $ 1,992,618 |
| 2009 | 684 | $3,571 | $ 2,442,564 |
| 2010 | 539 | $3,571 | $ 1,924,769 |
|  |  | **TOTAL** | **$ 10,155,924** |

| Year | Number of Non W-9 Wegelin Accounts | UBS Per-Account, Per-Year Multiplier, Assuming 11,000 UBS Accounts | Extrapolated Tax Loss Attributable to Wegelin |
|---|---|---|---|
| 2002 | 89 | $4,545 | $ 404,505 |
| 2003 | 143 | $4,545 | $ 649,935 |
| 2004 | 167 | $4,545 | $ 759,015 |
| 2005 | 195 | $4,545 | $ 886,275 |
| 2006 | 217 | $4,545 | $ 986,265 |
| 2007 | 252 | $4,545 | $ 1,145,340 |
| 2008 | 558 | $4,545 | $ 2,536,110 |
| 2009 | 684 | $4,545 | $ 3,108,780 |
| 2010 | 539 | $4,545 | $ 2,449,755 |
| | | **TOTAL** | **$ 12,925,980** |

As can be seen above, when the per-account per-year tax loss amounts attributable to UBS are multiplied by the number of Wegelin's non W-9 accounts by year for the entire relevant time period in Wegelin's case, it results in a <u>total</u> tax loss attributable to Wegelin of between $10.16 million and $12.93 million.[2]   And this is before making any reduction for payments made by the 245 Wegelin clients that participated in voluntary disclosure.[3]

---

[2]   <u>See</u> Gov't Mem. at 210 (UBS per-account per-year tax loss amount is between $3,571, assuming UBS had 14,000 non W-9 U.S. accounts, and $4,545, assuming UBS had only 11,000 non W-9 U.S. accounts); <u>see also</u> Gov't Mem. at 87 (detailing the number of non W-9 Wegelin accounts as of December 31 for each year from 2002 through 2010).

[3]   Wegelin agreed in the Plea Agreement not to seek any reduction in the Restitution Amount for "payments made to the Government by U.S. taxpayers through the Offshore Voluntary Disclosure Initiative and similar programs … before or after the date of this Agreement" and it does not seek any such reduction in making this argument.  <u>See</u> Wegelin Plea Agreement at p.2, Wegelin Mem. Ex. 2.  But Wegelin's agreement not to seek any offset for payments

Wegelin has only one purpose in bringing these details to the Court's attention: to bolster the Court's confidence that the agreed-to restitution amount of $20,000,001 does not understate the Government's actual loss but, far more likely, overstates it. Nonetheless, consistent with its stipulation in the Plea Agreement, Wegelin joins the Government in asking the Court to impose the sentence agreed to by the parties, including the payment of $20,000,001 in restitution.

## II.   IN LIGHT OF THE UNIQUE CIRCUMSTANCES OF THIS CASE, THE COURT SHOULD DECLINE TO IMPOSE A PERIOD OF PROBATION

As set forth in detail in Wegelin's Sentencing Memorandum ("Wegelin Mem." at 38-40), we respectfully submit that probation is not warranted in this case and that the Court can fashion a sentence to ensure that the Bank makes full payment of all financial obligations without the imposition of probation. In the alternative, we respectfully submit that any period of probation should be narrowly tailored simply to ensure payment of all financial obligations imposed at sentencing.

First, as the Government itself points out, Wegelin is not likely to have difficulty paying the monetary sentence imposed in this case. See Gov't Mem. at 16. Indeed, it has already set aside the necessary funds and it has demonstrated its commitment to resolving this case expeditiously – including by paying the $15.8 million forfeiture amount one day after the Court accepted its guilty plea, even though the Government had given it three days to do so.

Second, there is no basis to believe that Wegelin poses any risk of future misconduct. The Bank has only 10 inactive U.S. accounts remaining, and is winding down its operations. Wegelin Mem. at 39-40. Wegelin and its Swiss banking regulator, FINMA, have already agreed that, after the conclusion of this case, the Bank would begin the administrative process required to surrender its banking license. It is envisaged that as a first step, it will register a new, non-

---

under the voluntary disclosure program further supports the reasonable, albeit aggressive, nature of the restitution amount agreed to in the Plea Agreement.

banking, purpose for the company with the Register of Commerce and start liquidating the remaining banking assets.  After completion of the liquidation of the banking business, FINMA will cancel Wegelin's banking license.  FINMA will not only monitor the liquidation of the banking business, but will also enforce the non-banking purpose of the company in the future. Quite apart from the fact that Wegelin no longer intends to engage in the banking business, Wegelin will be unable to offer any banking services after its license has been surrendered, as it is a criminal offense in Switzerland to offer banking services without a banking license.  There is simply no support for a sentence of probation to attempt to deter future harm.

The Bank does not dispute that a sentence of probation can be appropriate as a means of insuring payment of restitution, see U.S.S.G. § 8D1.1(a)(1), or a payment of a fine or special assessment, at least where restrictions are necessary to safeguard the organization's ability to make the payments, see U.S.S.G. § 8D1.1(a)(2).  In this case, however, Wegelin has agreed to fulfill its monetary obligations under the Plea Agreement within 3 days of imposition of the sentence.  Rather than place Wegelin on probation to ensure payment, the Court has the power to fashion an approach to ensure payment, and prevent the needless expenditure of resources by the Probation Department.  For example, the Court could structure the sentence so that Wegelin has several days to make the payments, with a condition that probation would be imposed only if the payments were not made within that time.

In the alternative, the Court could impose a short period of probation, such as five to ten days, to ensure that Wegelin meets its commitment to submit the monetary sanction imposed upon it at sentencing, as the Court did in the United States v. Habibion case.  See Transcript of Sentencing Hearing at 19:19-20:2, 98:16-104:23; 106:14-20, United States v. Habibion, et al., No. CR 11-118 (D.D.C. May 16, 2012), Wegelin Mem. Ex. 6 (excerpt) (ordering probation

for a minimal duration only to ensure the entity's payment of the sentence, after discussing at length the fact that probation would otherwise be unwarranted given that the company was no longer engaged in any business, and imposing probation would constitute a waste of valuable resources); see also Wegelin Mem. at 39.

We respectfully disagree with the Final PSR's recommendation for probation of far longer duration.  First, for the reasons described above, a two-year term of probation is not justified in this case and is well beyond what either of the parties has sought.  Second, by suggesting that probation should require the "formal dissolution" of a closely-regulated foreign business, the PSR confuses the termination of the banking business with the "dissolution" of the entity.  See Final PSR at 43.  This suggestion could create the possibility of an unnecessary conflict between Swiss and U.S. legal requirements, and would unnecessarily insert the Probation Department into matters of Swiss domestic law to which it is ill suited and that may well violate principles of international comity.  Third, as discussed above, probation is not needed to ensure payment of restitution, and therefore a "special condition requiring the defendant to provide the probation officer with access to any requested financial information and documentation" in order to ensure payment of restitution is wholly unnecessary.  See Final PSR at 43.  As Wegelin has committed to paying the restitution in full within three days of sentence, there is no need for the Probation Department to waste its valuable resources trying to supervise a foreign entity already under regulatory supervision.  In short, there is no need for probation in this case, much less an extended term of probation.  We respectfully submit that no period of probation should be ordered, or, in the alternative, that any period imposed be nominal to ensure full payment of the sentence within the three days stipulated in the Plea Agreement.

III.   **CONDUCT THAT THE GOVERNMENT DEEMS "EXTRAORDINARILY WILLFUL" WAS THE NATURAL CONSEQUENCE OF AGREEING TO ACCEPT CLIENTS IRRESPECTIVE OF THEIR TAX STATUS**

Wegelin helped U.S. taxpayers evade their U.S. tax obligations.  It did so by permitting U.S. taxpayers to open accounts without concern for whether the U.S. taxpayers intended to declare their bank or securities accounts to the IRS and pay tax on the gains and income thereon. Wegelin has pled guilty and accepted responsibility for its conduct in conspiring to help U.S. taxpayers evade taxes.  It offers no defense to this conduct.

Without intending to diminish the seriousness of Wegelin's conduct (which Wegelin acknowledges was criminal under U.S. law), we respectfully submit that the Government's sentencing submission is incorrect in attempting to paint Wegelin as a rogue institution behaving in ways far worse than its peer banks.  Wegelin has agreed that it violated U.S. law and, we respectfully submit, has acted laudably in coming to the United States, accepting responsibility for its conduct and pleading guilty, despite legal arguments that it could remain in Switzerland and resist doing do.  These are hardly the acts of a rogue bank.

In its Sentencing Memorandum, the Government has seized upon a number of activities that are the ordinary consequences of allowing U.S. clients to open accounts at the Bank.  While assisting in tax evasion was wrong, none of this conduct evidences a heightened state of willfulness; instead, this conduct generally reflected typical bank practices that applied to all clients, including clients who declared their assets and paid their taxes.  Although the Government insists otherwise, this *is* in fact a case in which Wegelin's standard and, at least with respect to U.S. clients, "run-of-the-mill banking services," were utilized by U.S. taxpayers to facilitate their tax evasion.  Gov't Mem. at 12-13.

The Government has also deemed as "offensive" and "aggravating factors" Wegelin's explanation of what it believed were its duties under Swiss and U.S. law, and the reasons for its

beliefs.  Gov't Mem. at 13-14.  We respectfully submit that the Government has missed the point.  These explanations are not intended to excuse or justify Wegelin's conduct – for which the Bank takes full responsibility – but rather serve as an explanation as to why Wegelin, a Swiss-focused bank with no appreciable U.S. business for the great majority of its existence, wrongly believed that it could accept non W-9 U.S. clients without facing a risk of criminal prosecution in the United States.

A.     **Wegelin Did Not Actively Assist Clients In Creating Sham Structures To Circumvent The IRS's Qualified Intermediary Agreement**

The Government claims that Wegelin opened accounts in the name of "sham" foreign corporations.  Gov't Mem. at 2-3.  Wegelin does not dispute that it opened and maintained accounts for offshore corporations, including entities that were owned by U.S. taxpayers, and admits that it did so with the knowledge that many of the accounts would be used to evade U.S. tax.  Wegelin Mem. at 35.  Wegelin, however, disputes the Government's assertion that it knew these corporations and foundations were "sham" entities, and the related assertion that Wegelin accepted documents that falsely indicated that the entities were the beneficial owners of these accounts.

First, as set forth in Wegelin's Sentencing Memorandum, as far as Wegelin knew and understood, the offshore entities that held accounts at the Bank were _not_ shams.  Wegelin understood that a sham entity was one that did not respect corporate formalities.[4]  Consistent with this understanding, Wegelin attempted to ensure that the corporate form of these offshore entities was respected such that the U.S. taxpayers who owned them did not control the

---

[4]     It is more than a little ironic that the UBS DPA – a document that undoubtedly signals the Government's view at least as of February 18, 2009 – contains that same definition of "sham" companies in the tax evasion context, explaining that a sham entity is one that does not "respect corporate formalities."  UBS DPA, Statement of Facts ¶ 11; see also Wegelin Mem. at 34.

management and disposition of the assets in the company accounts, or otherwise cause the companies to function in disregard of the formalities of corporate ownership.  Wegelin Mem. at 34-35.  The Government is constrained to acknowledge that Wegelin did typically ensure compliance with these corporate formalities.  Gov't Mem. at 3.

Moreover, as discussed in detail in Wegelin's Sentencing Memorandum, the concern expressed about the use of "sham" entities in the UBS case was that they were used at UBS to facilitate tax evasion by allowing U.S. clients to _hold U.S. securities in these offshore entity accounts_ in order to circumvent the reporting obligations under its Qualified Intermediary ("QI") Agreement with the IRS.  See Wegelin Mem. at 34-35 (citing UBS DPA, Statement of Facts ¶¶ 2, 9-12).  With only rare exceptions, Wegelin _did not_ allow offshore entity accounts to hold U.S. securities; Wegelin did not tolerate circumvention of its obligations under the QI Agreement. Wegelin Mem. at 35.  We respectfully submit that Wegelin's compliance with its obligations under the QI Agreement is not conduct consistent with that of a rogue bank.  Id.

The Government next asserts that Wegelin should have known that these entities were shams not because they were "shams" under the rationale of the UBS DPA, but because they were used as vehicles for evasion of the U.S. clients' FBAR obligations.  See Gov't Mem. at 3 (citing 31 C.F.R. § 1010.350(e)(3)).  But this argument is misleading.  The C.F.R. provision cited by the Government was not issued until February 2011, after the time frame relevant to this case, and so says nothing relevant about Wegelin's knowledge.  See Reports of Foreign Financial Accounts, 76 Fed. Reg. 10,245, 10,246 (Feb. 24, 2011) (codified at 31 C.F.R. § 1010.350(e)(3)). In any event, this provision applies to U.S. persons, and does not turn an otherwise valid corporate entity into a sham; it simply prohibits a U.S. person from using corporations and other entities to evade tax reporting obligations.

Finally, this argument appears to rely on the unfounded assumption that Wegelin was involved in the creation of such entities, as UBS admittedly was.  See Gov't Mem. at 3 (citing 31 C.F.R. § 1010.350(e)(3)), which depends on the U.S. person having "created" an entity "for a purpose of evading" his U.S. obligations); see also UBS DPA, Statement of Facts ¶ 11 (stating that UBS "form[ed] offshore companies in order to enable such clients to evade the U.S. securities investment restrictions in the QI Agreement").  With extremely limited exceptions, this is simply not true.  The vast majority of offshore entities that held non W-9 accounts at Wegelin – including the entities that were utilized by former UBS U.S. clients – were created prior to the accounts being opened and without Wegelin's involvement.  Even with respect to those limited instances in which a Wegelin client advisor referred a client to an outside professional for assistance setting up an entity, these client advisors typically had no involvement in the subsequent interactions to create the entity.[5]

In addition, Wegelin did not open accounts held in the name of offshore entities for the purpose of concealing in the Bank's records the identities of the beneficial owners of these accounts.  As set forth in detail below, consistent with its obligations under Swiss law, Wegelin

---

[5]    Moreover, the Government's assertion that the only reason U.S. taxpayers would seek assistance from lawyers or other professionals to form an entity is to evade their taxes ignores the entire concepts of tax avoidance and asset protection, among other things. Indeed, the Guardian article cited by the Government in its sentencing submission expressly states that Swiss banks assist in "legal tax avoidance" in addition to tax evasion.  Gov't Mem. at 14-15 (citing In the Country Where Tax Evasion Is No Crime, Swiss Private Banks Are Unrepentant About Siphoning Off Other Governments' Income, The Guardian (Feb. 4, 2009), available at www.guardian.co.uk/business/2009/feb/05/tax-gap-avoidance-switzerland.

Even in the wake of the UBS investigation, FINMA reported that "[t]he use of structures such as trusts, foundations, and other domiciliary companies within the framework of a private client relationship corresponds to a legitimate need and is legally permissible pursuant to both U.S. and Swiss law."  EBK Investigation of the Cross-Border Business of UBS AG with its Private Clients in the USA:  Summary Report (the "FINMA Summary Report"), at 12 (Feb. 18, 2009), available at http://www.finma.ch/d/aktuell/Documents/kurzbericht-ubs-x-border-20090218-e.pdf.

obtained documentation for all accounts, including accounts for offshore companies, which properly identified the individual beneficial owner of the assets held in the account.  Wegelin also obtained documentation that identified the beneficial owner of the income in the account for tax purposes, consistent with its obligations under the QI Agreement.  Wegelin had no basis to believe that either set of documentation was false.  Instead, these documents simply reflected the fact that the Swiss and U.S. systems defined the term "beneficial owner" differently for these different purposes.

First, for purposes of complying with Swiss law "Know-Your-Customer" rules in connection with Anti-Money Laundering regulations – rules that Wegelin was subject to for _all_ its clients – Wegelin was required to obtain from all clients a document known as the Swiss "Form A," a standard component of due diligence required in the Swiss banking industry.  See, e.g., Final PSR ¶ 42; Indictment ¶ 21.  The Swiss Form A required identification of the "beneficial owner" of each account, as defined as the "_owner of the assets_" held in the account. See Agreement on the Swiss banks' code of conduct with regard to the exercise of due diligence, Art. 1 Preamble, Art. 4(3), Ex. A (emphasis added).  For accounts held in the name of an entity without a commercial or industrial activity, the "beneficial owner" under Swiss law is deemed to be the shareholders or owners of the entity – often the U.S. taxpayer who owns the entity.  See id.

On the other hand, for purposes of complying with its obligations as a QI bank, Wegelin was required to obtain information that identified the "beneficial owner" for those accounts for which it had QI reporting obligations.  The QI Agreement expressly provides that the term "beneficial owner" has the meaning given to it in Treasury Regulations, namely "_the owner of the income for tax purposes_."  QI Agreement, Rev. Proc. 2000-12, 2000-4 I.R.B. 387, § 2.06,

available at www.irs.gov/pub/irs-drop/rp-00-12.pdf, referring to Treas. Reg. §1.1441-1(c)(6)(i)

(emphasis added).[6]   For accounts held in the name of corporations, under U.S. tax law, this

"beneficial owner" is the corporation itself.   See Treas. Reg. §1.1441-1(c)(6)(ii) (explaining that

only certain entities are "look through" for purposes of determining the beneficial owner under

U.S. tax law, meaning that the owner of the entity and not the entity itself is the beneficial owner

– namely foreign partnerships, foreign simple trusts and foreign grantor trusts; foreign

corporations are not among the listed "look through" entities).

The fact that U.S. tax law provides that the beneficial owner of a corporate account is the

corporation – not the U.S. taxpayer that ultimately owns that corporation – has been reiterated by

the U.S. Government, including in recent proposals to amend the QI system's successor regime,

the Foreign Account Tax Compliance Act ("FATCA").[7]   The fact that the Swiss Form A and the

QI Agreement both use the term "beneficial owner" to mean different things does not suggest

that compliance with both requirements is evidence of any wrongdoing.[8]   However, Wegelin's

---

[6]   Wegelin entered into a QI Agreement with the IRS in December 2000, which took effect
beginning in 2001.  This agreement was based on the IRS's model QI Agreement, Rev.
Proc. 2000-12, 2000-4 I.R.B. 387.   The language discussed in this memorandum is
consistent with the specific agreement between the IRS and Wegelin as well as in the model
agreement; as a result, we use the term "QI Agreement" in this memorandum to refer to both
agreements.

[7]   See Joint Committee on Taxation, General Explanation of Tax Legislation Enacted in the
111 Congress, Part VII, Revenue Provisions of the Hiring Incentives to Restore
Employment Act, P.L. 111-147, Title V.A., Foreign Account Tax Compliance, JCS-2-11
(March 2011), at 198 n.479 ("The United States imposes tax on the beneficial owner of
income, not its formal recipient. … A corporation (and not its shareholders) ordinarily is
treated as the beneficial owner of the corporation's income.  Similarly, a foreign complex
trust ordinarily is treated as the beneficial owner of income that it receives, and a U.S.
beneficiary or grantor is not subject to tax on that income unless and until he receives a
distribution.") (emphasis added).

[8]   The Swiss Bankers Association ("SBA"), an entity that was closely involved with the IRS in
implementing the QI system in Switzerland and which Swiss banks including Wegelin relied
on for information about the QI Agreement's requirements, reported that the IRS itself did
not view the Swiss Form A as relevant for QI purposes.  See Unofficial Translation of SBA

understanding that it was acting in compliance with these obligations in no way mitigates the fact that it assisted clients to evade their U.S. tax obligations, in violation of U.S. law.

As a result, the documents that Wegelin accepted for QI compliance purposes which indicated that the beneficial owners of accounts held in the name of offshore entities were the entities themselves are not "false" documents.  The fact that the beneficial owners of these same accounts as reported on the Swiss Form As, for Swiss law purposes, were the U.S. taxpayers who owned the entities, does not indicate otherwise.

Wegelin does not dispute that the fact that it allowed U.S. clients to open non W-9 accounts held in the name of offshore entities may have facilitated these clients' tax evasion. But the Bank did not allow the use of "sham" entities, as that was understood at the time, or maintain false documents relating to these accounts.

---

Circular 6971 at 4-5, April 7, 2000 ("The IRS had stated expressly during the last meeting, that if the customer of the bank is to be seen as the beneficial owner according to the U.S. standards, so any information to the contrary on Form A will not be taken into consideration."), Ex. B.  The unofficial English translation of SBA Circular 6971 was prepared by Goodwin Procter from the original German document.  The original German document is attached as Ex. C.

Indeed, the IRS itself published a notice in 2001 that explained that the information sought under the QI regime was not the same as the information necessary for Swiss "Know-Your-Customer" purposes:

> Use of the term 'know your customer' in the QI context should not be confused with the use of that term in other contexts, specifically including the use of the term in the area of international standards relating to money laundering control. As used in the QI context, the term 'know your customer' generally relates to the capacity of financial institutions to determine whether their customers are U.S. persons and, if their customers are non-U.S. persons claiming the benefits of an income tax treaty, whether these customers are residents of the applicable treaty country. … *Although the meaning of the term 'know your customer' in the QI context is often closely related to the meaning of the term in the broader context of money laundering control, the concepts are nevertheless distinct and should not be regarded as having the same meaning or scope*.

IRS Notice 2001-4, 2001-2 I.R.B. 267 available at www.irs.gov/pub/irs-drop/n-01-4.pdf (emphasis added).

**B.**     **Wegelin's Use Of Its U.S. Correspondent Bank Account**

Likewise, Wegelin used its correspondent account at UBS AG Stamford primarily to execute U.S. dollar transactions, which made up the bulk of the activity of the account. Correspondent bank accounts are a ubiquitous feature of international banking.   As the Government acknowledges, "[f]inancial institutions that wish to transact in U.S. dollars are greatly in need of correspondent bank accounts in the United States."  Gov't Mem. at 16.  The Government engages in a lengthy discussion of the use of Wegelin's correspondent account by other Swiss banks.  See Gov't Mem. at 3-5.  Wegelin does not dispute that it allowed other Swiss banks to execute transactions through its correspondent account.   Not only is this type of "nested" correspondent account standard practice in the banking industry, but in Wegelin's case, this was the result of Wegelin's providing "back office" support to some other Swiss banks that chose not to replicate these back office functions themselves.  See Wegelin Mem. at 12.  When Wegelin processed U.S. dollar transactions for these other banks, it was the _banks_ that were Wegelin's clients and, as a result,   Wegelin did not know any details about the underlying clients, or the underlying purpose, behind the transactions.   We respectfully submit that nothing about the use of the correspondent account by other banks suggests that Wegelin facilitated tax evasion in an "extraordinarily" willful manner.

**C.**     **Wegelin's Directives Restricting Communications With U.S. Clients**

The Government incorrectly cites Wegelin's policies to restrict correspondence with U.S. clients while these clients were in the United States as evidence of the Bank's "extraordinarily" willful conduct in facilitating tax evasion.  See Gov't Mem. at 9-10.  Wegelin did have a general policy that restricted mailing account statements and related documents to U.S. clients in the United States, and instead required that U.S. clients have their mail held at the Bank.  See Gov't Mem. at 10.  In addition, Wegelin instructed its client advisors not to communicate with U.S.

16

clients by telephone, e-mail or fax when these clients were, or could be, in the United States, and instructed these client advisors to convey the same message to their U.S. clients.  See Gov't Mem. at 9.  These directives, however, were put in place to _comply_ with U.S. law relating to investment advice, although Wegelin acknowledges that they may have given U.S. clients added comfort that the accounts would remain hidden.

From as early as 2004, years before the UBS investigation, Wegelin expended significant time and energy attempting to develop its understanding of U.S. securities law restrictions, including particularly those set forth in the Investment Advisers Act ("IAA"), the Securities Exchange Act and the Securities Act.  Consistent with its understanding of the restrictions set forth in these laws, Wegelin adopted directives to minimize the possibility that its employees would violate these laws.  The directives that the Government cites were specifically put in place in an effort to avoid running afoul of the IAA's prohibition on unregistered investment advisers communicating with U.S. clients while those clients were in the United States.  See Wegelin Mem. at 33.

In fact, these directives were reiterated with increased emphasis after the UBS investigation and subsequent DPA became public.  It was logical for Wegelin to reinvigorate its efforts to comply with U.S. securities laws when it understood that UBS's violations of those laws were critical to the U.S. Government's investigation into UBS and the resulting DPA, as discussed in Wegelin's Sentencing Memorandum and Section III(D), infra.

Wegelin does not dispute that the result of its policies that restricted communication with U.S. clients in the United States may have facilitated tax evasion in some respects, as these policies applied to all U.S. clients – including non W-9 U.S. clients – but they were not put in place in order to do so.

17

**D.**     <u>Wegelin's Acceptance Of Former UBS U.S. Clients</u>

The Government focuses much of its brief on the fact that Wegelin opened accounts for certain former UBS U.S. clients in the 2008-2009 time period, in the wake of news about the UBS investigation and subsequent UBS DPA.  <u>See</u> Gov't Mem. at 5-9.  Clearly, Wegelin wishes that it had never done so.  But it did not appreciate the sea-change that was occurring in U.S. enforcement of its tax laws against Swiss banks, as evidenced by the UBS case, mistakenly believing that the focus in that case was on the widely reported activities of UBS employees interacting with clients in the United States.[9]

As an initial matter, Wegelin did not actively pursue U.S. clients fleeing from UBS.  It did not engage in marketing targeted to former UBS clients, did not advise its personnel to seek out former UBS clients, and did not establish relationships with financial advisors or others to acquire former UBS clients.  Rather, as the Government acknowledges, these clients were "walk-

---

[9]     <u>See, e.g.</u>, Unofficial Translation of Lukas Hässig, <u>U.S. Unhinge Banking Secrecy</u>, SPIEGEL ONLINE, Jun. 20, 2008 ("The bank managers encouraged Birkenfeld and other client advisors to travel to the United States in order to acquire new clients and to provide services to already existing clients."), Ex. D (original German document attached as Ex. E); Unofficial Translation of Andreas Flütsch, <u>UBS Management Knew Exactly What They Were Doing</u>, TAGES-ANZEIGER, Feb. 20, 2009 ("some UBS bankers were acting like secret agents, travelling to the United States incognito, in order to seek out new wealthy clients or giving financial advice to already existing clients"), Ex. F (original German document attached as Ex. G); Unofficial Translation of Lukas Hässig, <u>Miami Vice</u>, SONNTAGSZEITUNG, Jul. 12, 2009 (reporting that UBS maintained an office in Miami's financial district where it advised wealthy clients with offshore accounts; hosted prospective "offshore" clients during Miami's Art Basel and threw parties at lavish hotels and private residences; and that shortly after such events UBS's "expert teams were presenting tailored financial solutions" for their guests), Ex. H (original German document attached as Ex. I); Unofficial Translation of Lukas Hässig, <u>The United States Want[s] The Names Of 10,000 UBS Clients</u>, SONNTAGSZEITUNG, Jul. 26, 2009 (reporting that, according to a U.S. Senate report, each of 60 client advisors working for UBS's offshore  business travelled from Switzerland to the United States "up to three times a year and met with about 4 clients each day during his one to three week long stay," ensuring that "each U.S. client received at least one visit" from his Swiss banker per year), Ex. J (original German document attached as Ex. K).

in" clients that found their way to Wegelin either on their own or in consultation with their former client advisors, independent of Wegelin.  See Gov't Mem. at 6.  Many of these clients came to Wegelin because they, like Wegelin, believed that the small, Swiss-only banks were not prosecutorial targets owing to their smaller size, lack of U.S. presence, and greater passivity – the very factors that Wegelin believed distinguished it from UBS.  See Wegelin Mem. at 32-37.

In the eyes of Wegelin, the investigation and prosecution of UBS was focused on several distinct activities and practices that had little in common with the way Wegelin worked with its U.S. clients.  See id.  First, contemporaneous reports about UBS's misconduct focused heavily on its aggressive marketing and servicing of undeclared U.S. clients in the United States.[10] Second, it was reported that UBS had helped its U.S. clients with undeclared accounts to create structures that would permit them to continue hold U.S. securities in violation of UBS's QI Agreement with the IRS.[11]  Finally, reports indicated that UBS had engaged not merely in tax evasion, but rather in tax fraud – even by Swiss standards.[12]

---

[10] See supra n.11.  See also FINMA Summary Report at 14 (referring to UBS's "strong presence in the USA").

[11] See, e.g., Unofficial Translation of Lukas Hässig, Negotiations For UBS Failed, SONNTAGSZEITUNG, Jun. 22, 2008 (reporting that the government cooperator admitted that UBS's managers and client advisors "helped these wealthy U.S. clients hide their assets, by helping to set up offshore structures"), Ex. L (original German document attached as Ex. M); FINMA Summary Report at 12 (stating that, ignoring admonitions from the Swiss Bankers Association, some UBS client advisors "not only referred their clients to selected providers of Non-Flow-Through structures, but also actively advised them beforehand, accompanied them to visit such providers or even arranged to meet the client with the provider in the USA," although UBS management knew this could be seen as circumventing the QI Agreement).

[12] See, e.g., Unofficial Translation of Lukas Hässig, Why UBS Is Sacrificing The Principle Of Banking Secrecy, ZEIT ONLINE, Feb. 20, 2009 (Swiss Finance Minister announced that some UBS clients committed tax fraud, not simply tax evasion), Ex. N (original German document attached as Ex. O); Unofficial Translation of Lukas Hässig, UBS Client Data Will Be Disclosed To U.S. Authorities Soon, SONNTAGSZEITUNG, Oct. 26, 2008 (reporting that 250 U.S. clients of UBS will be disclosed to U.S. because they committed tax fraud), Ex. P (original German document attached as Ex. Q).

This message was not only discussed in the Swiss banking industry, but it was reiterated in the UBS DPA itself.   See Wegelin Mem. at 33-37.   Indeed, the Government even acknowledges that the $400 million tax component of UBS's DPA was connected to taxes owed by undeclared U.S. taxpayers "who were actively assisted or facilitated by UBS private bankers who _met these clients in the United States and communicated with them via United States jurisdictional means on a regular and recurring basis_."   Gov't Mem. at 7 (emphasis added). U.S. Senate Hearings focused on UBS conducting its offshore banking business in the United States, including repeated accounts of the tremendous amount of travel by UBS's Switzerland-based advisors to market and service U.S. clients in the United States.   See "Tax Haven Banks And U.S. Tax Compliance:   Obtaining The Names Of U.S. Clients With Swiss Accounts," Transcript of Senate Hearing Before The Permanent Subcommittee On Investigations Of The Committee On Homeland Security And Governmental Affairs, S. Hrg. 111-30 at 5 (Mar. 4, 2009) (UBS bankers violated U.S. tax law "by traveling to this country, with client code names, encrypted computers, counter-surveillance training, and all the rest of it, to enable U.S. residents to hide assets and money in Swiss accounts" and "then returned to Switzerland and treated their conduct as blameless since Swiss law says tax evasion is no crime."); id. at 11 (statement of John A. DiCicco, Acting Assistant Att'y Gen., Tax Div., U.S. Department of Justicen) ("UBS bankers routinely traveled to the United States to market Swiss bank secrecy to U.S. clients interested in attempting to evade U.S. income taxes.").

Wegelin – which had only minimal contact with U.S. clients in the United States and which implemented directives to prohibit use of U.S. jurisdictional means – viewed itself as starkly different than UBS.   See Wegelin Mem. at 36; Section III(C), supra.   As a result, despite Wegelin's awareness of the U.S. investigation of UBS, Wegelin approved the opening of these

non W-9 accounts based on its incorrect belief that it would not be prosecuted in the United States.  Thus, as these clients showed up on Wegelin's doorstep, Wegelin either accepted or rejected them; this was not the result of an affirmative decision to do something new, but merely the continued application of Wegelin's account-opening criteria.[13]  Over time, and as the number of former UBS clients turning up at Wegelin increased, the Bank adopted even more stringent account-opening criteria.

In addition, as the Government acknowledges, once Wegelin began to appreciate the full impact of the DPA and the fact that it too faced a risk of prosecution, despite its differences from UBS, Wegelin _did_ undertake remedial action:  in the fall of 2009, only about six months after the UBS DPA became public, Wegelin decided that it would no longer accept new non W-9 U.S. clients, and in 2011 Wegelin decided to fully exit its U.S. business.  See Gov't Mem. at 8-9; Final PSR at ¶ 88.  The fact that larger Swiss banks that were closely aligned with UBS in terms of size and scope of their U.S. business exited their U.S. business earlier is not, as the Government asserts, evidence that Wegelin was more egregious.  See Gov't Mem. at 13.  Rather, it is no surprise that these banks more quickly recognized that they faced a very real risk of prosecution akin to the case against UBS.

Finally, Wegelin's policy with respect to the IRS's announcement of the Offshore Voluntary Disclosure Program ("OVDP") was to assist clients who wanted to voluntarily disclose their accounts to the IRS.  While the Government asserts that, in one instance, a Wegelin client advisor told a U.S. client's spouse not to make voluntary disclosure, if this did occur it would have been in violation of Wegelin's policy.  See Gov't Mem. at 9.  Wegelin is not

---

[13]    The Government incorrectly asserts that Wegelin did not normally accept walk-in clients.  See Gov't Mem. at 6.  In fact, this practice was not unusual at Wegelin, although the volume of new prospective U.S. clients certainly was.

aware of any client advisors having violated its policy or advising clients not to undergo voluntary disclosure.   Likewise, to the extent that Wegelin client advisors corresponded with clients in the context of assisting them in undergoing voluntary disclosure, the Bank viewed this as clearly not providing investment advice, and thus not at risk of running afoul of the IAA.

**E.**        **Wegelin's Belief That It Acted In Accordance With, And Not In Violation Of, Swiss Law, Is Consistent With Accepting Responsibility**

Even though the wording of Wegelin's Allocution had been reviewed by the prosecutors before the Plea Agreement was executed, the Government now attacks Wegelin's explanation in that Allocution for why the Bank believed that it would not be prosecuted for its conduct, claiming that this explanation is "offensive."  See Gov't Mem. at 13-14.  We respectfully submit that this argument misses the point of the explanation, offered not to excuse Wegelin's conduct, but to explain to the Court how Wegelin made the horrible error it did in accepting U.S. undeclared accounts.

To be sure, Wegelin understood that tax evasion was a crime under U.S. law.  It also understood that opening accounts for undeclared U.S. taxpayers would help those who wanted to evade taxes.  But it did not clearly understand that its own conduct – in opening and maintaining non W-9 accounts for U.S. taxpayers – would subject it to prosecution and punishment for doing what it was legally entitled to do under Swiss law.  This understanding was consistent with the long history of non-prosecution of Swiss banks and bankers in the United States for assisting in tax evasion, notwithstanding the U.S. Government's undeniable awareness of this activity.  As the Government acknowledges, prior to the UBS case, "prosecutions of U.S. taxpayers taking advantage of Swiss bank secrecy to evade taxes were uncommon."  Gov't Mem. at 16. Prosecution of Swiss banks for assisting in this conduct was unprecedented.

Swiss banking privacy and its potential for concealing tax evasion by U.S. persons has never been a secret.  It is not surprising that Swiss banks may have failed to understand that the United States' long-standing policy of not prosecuting wholly foreign banks for assisting in tax evasion had changed.  In addition, as set forth in Wegelin's Sentencing Memorandum and Section III(D), supra, this understanding was reasonable even after the UBS DPA, as the public perception in Switzerland was that UBS was targeted specifically for its pervasive interactions with current and potential U.S. clients on U.S. soil and its intentional violations of the QI Agreement.

We respectfully submit that these factors are not, as the Government argues, "aggravating" – but are in fact precisely the types of unique circumstances that this Court should consider pursuant to 18 U.S.C. § 3553(a).

**IV.**     <u>**CONCLUSION**</u>

For the foregoing reasons and those set forth in Wegelin's Sentencing Memorandum, we respectfully request that the Court accept the considerable sentence to which the parties have agreed, and impose sentence consistent with the Plea Agreement, including restitution in the amount of $20,000,001 and a criminal fine in the amount of $22,050,000.

Dated:          February 28, 2013

Respectfully submitted,

Goodwin Procter LLP

By:  /s/ Richard M. Strassberg
Richard M. Strassberg
Anne E. Railton
Valerie A. Haggans
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel: (212) 813-8800
Fax: (212) 355-3333
rstrassberg@goodwinprocter.com

John Moustakas
901 New York Avenue, NW
Washington, D.C. 20001
Tel.: (202) 346-4000
Fax: (202) 346-4444
jmoustakas@goodwinprocter.com